FREED v SALAS

Docket No. 283317. Submitted June 9, 2009, at Detroit. Decided December
1, 2009, at 9:00 a.m.

Karl Freed, as the personal representative of the estate of Bretton J.
Freed, deceased, brought an action in the Wayne Circuit Court,
Michael J. Callahan, J., against Kimberly J. Salas, Healthlink
Medical Transportation Services, Inc., Waste Management of
Michigan, Inc., and William Whitty, seeking damages arising from
the injury and death of the decedent as the result of a motor
vehicle accident that occurred when the decedent was a passenger
in a Healthlink ambulance driven by Salas that failed to stop at a
stop sign and was hit by a Waste Management garbage truck
driven by Whitty. Following an agreement between the plaintiff
and Healthlink in which Salas admitted negligence, Salas was
dismissed with prejudice. The disputed issues at trial appear to
have been whether the garbage truck was being operated in excess
of the speed limit or a reasonable speed, the percentage of fault to
assign to the defendants, and whether the decedent (already a
spastic quadriplegic as a result of injuries sustained in an automo-
bile accident about 17 years earlier) could feel pain or have
knowledge of his injuries or impending death. Before the jury was
instructed, an order was entered dismissing Whitty from the
action with prejudice. The jury found both Healthlink and Waste
Management negligent, assigned fault at 55 percent and 45
percent, respectively, and awarded damages totaling $14 million,
$6,529,353.70 of which was against Waste Management. Waste
Management appealed following the denial of its motions for a new
trial, remittitur, or judgment notwithstanding the verdict (JNOV).

The Court of Appeals *held*:

1. Waste Management waived any claim that the dismissal of
Whitty automatically resulted in its dismissal by failing to raise
that issue at the appropriate time. Regardless, plaintiff's claim
against Waste Management under the owner's liability act, MCL
257.401, survived the dismissal. Even when dismissal of a vicari-
ously liable defendant is appropriate based on agency principles, it
will not preclude a plaintiff's claim or recovery against that
defendant based on the vehicle owner's liability statute where

such a claim has been pleaded. The trial court did not err by denying Waste Management's motion for JNOV.

2. Waste Management failed to object to the request not to disclose to the jury the "high-low" agreement between plaintiff and Healthlink, which provided that Salas would be dismissed with prejudice, Healthlink would be liable for all of Salas's actions, and that Healthlink would admit that its negligence was a proximate cause of the decedent's death in exchange for between $900,000 and $1,000,000. The trial court did not err by denying Waste Management's motion for a new trial that was based on the trial court's failure to disclose the agreement to the jury. Had the trial court performed a balancing test to weigh the interest of fairness served by disclosure of the true alignment of the parties to the jury against the countervailing interests in encouraging settlements and avoiding prejudice to the parties by revealing settlements, it still would not have required disclosure of the agreement. The agreement also was not a *"Mary Carter"* agreement, see *Booth v Mary Carter Paint Co*, 202 So 2d 8 (Fla App, 1967).

3. The plaintiff did provide evidence regarding the decedent's conscious pain and suffering from which the jury could conclude that the decedent had a fear of impending doom or death and conscious pain and suffering. The trial court did not err by denying Waste Management's motion for JNOV.

4. The trial court did not err by allowing an expert retained by plaintiff, Dr. Werner Spitz, to testify that the decedent "could have" had certain experiences, such as having a sense of fear or death.

5. The trial court's paraphrasing of certain statutes when giving M Civ JI 12.01, although awkward, was accurate and a more artful reading of the instruction would not have affected the outcome of the case.

6. The trial court did not abuse its discretion under the facts of this case by failing to give the sudden emergency instruction set forth in M Civ JI 12.02.

7. The awards for conscious pain and suffering and lost companionship were not excessive. The trial court did not abuse its discretion by denying Waste Management's motion for remittitur.

8. The trial court did not abuse its discretion by permitting accident reconstruction experts to give their opinions regarding fault and ordinary negligence. If error did occur, it did not taint the entire trial.

9. The trial court did not abuse its discretion by failing to take judicial notice of the speed limit in the area where the accident

occurred. The speed limit was not undisputed or capable of accurate and ready determination.

Affirmed.

TALBOT, J., concurring in part and dissenting in part, concurred in the result only with regard to the determinations that the dismissal of Whitty did not preclude a finding of Waste Management's liability under the owner's liability statute, MCL 257.401, that the high/low agreement was not a *"Mary Carter"* agreement, that the trial court's wording of M Civ JI 12.01 was not erroneous, and that the trial court correctly refused to take judicial notice of the speed limit. Judge TALBOT dissented on the remaining issues and stated that because of the obvious errors in the conduct of the trial, and with particular emphasis on the impropriety of the expert testimony elicited, he would reverse the judgment and remand for a new trial regarding Waste Management's liability and damages. The trial court improperly permitted the accident reconstruction experts to opine on the ultimate issues of Waste Management's negligence and proportion of fault and erred in failing to instruct the jury regarding the sudden emergency doctrine. The trial court erred by allowing Dr. Spitz to testify beyond his identified area of expertise and the doctor's testimony was impermissibly speculative and without an adequate basis. The doctor's testimony exceeded the limitations that the trial court had placed on his testimony. Waste Management did object to the combination of an award of damages for pain and suffering and loss of society on the jury verdict form. The propriety or reasonableness of those awards cannot be determined because they were combined, therefore, the sufficiency of the evidence to support those awards must be questioned.

1. MOTOR VEHICLES — OWNERS LIABILITY — ACTIONS — PARTIES — AGENCY.

Even when the dismissal of a vicariously liable defendant is appropriate based on agency principles, it will not preclude a plaintiff's claim or recovery against that defendant based on the motor vehicle's owner's liability statute where such a claim has been pleaded (MCL 257.401).

2. NEGLIGENCE — JURY INSTRUCTIONS — SUDDEN EMERGENCY DOCTRINE — EXCUSED VIOLATIONS OF STATUTE.

The sudden emergency instruction set forth in M Civ JI 12.02 is intended to allow a jury to excuse the violation of a statute from which negligence may be inferred; the sudden emergency doctrine provides a basis for a defendant to be excused of a statutory violation in regards to the events that occur after the defendant

discovers the emergency; the instruction is not to be given in all negligence cases or as to all claims of negligence and is not intended to excuse negligence as such; the instruction may only be given with regard to statutory violations referenced in M Civ JI 12.01.

3. DAMAGES — VERDICTS — EXCESSIVE DAMAGES.

The factors that should be considered by a reviewing court in determining whether a verdict is excessive are: whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; and whether the amount actually awarded is comparable with awards in similar cases both within the state and in other jurisdictions.

4. WITNESSES — EXPERT WITNESSES — OPINION TESTIMONY — OPINION ON ULTIMATE ISSUES.

Expert testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be determined by the trier of fact such as fault and ordinary negligence (MRE 704).

5. EVIDENCE — JUDICIAL NOTICE.

A fact must be one not subject to reasonable dispute, in that it is either generally known within the territorial jurisdiction of the trial court or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, before a trial court may take judicial notice of the fact; taking judicial notice is discretionary (MRE 201[b], [c]).

*Fieger, Fieger, Kenney, Johnson & Giroux, P.C.* (by *Victor S. Valenti*), for Karl Freed.

*Tanoury, Nauts, McKinney & Garbarino, P.L.L.C.* (by *Linda M. Garbarino*), for Kimberly J. Salas and Health-link Medical Transportation Services, Inc.

*John P. Jacobs, P.C.* (by *John P. Jacobs*), for Waste Management of Michigan, Inc.

Before: FITZGERALD, P.J., and TALBOT and SHAPIRO, JJ.

SHAPIRO, J. In this vehicle negligence and wrongful death action, defendant Waste Management of Michigan, Inc., appeals as of right a judgment awarding plaintiff Karl Freed, as personal representative of the estate of Bretton J. Freed, deceased, $6,529,353.70 from Waste Management. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

This action arose from the death of 35-year-old Bretton Freed. Freed, already a spastic quadriplegic from an accident in April 1987, when he was 18 years old, was being transported from Oakwood Annapolis Hospital, where he had been treated for pneumonia or urosepsis, back to his fulltime care facility, Special Tree Rehabilitation, in an ambulance owned by defendant Healthlink Medical Transportation Services, Inc., and driven by defendant Kimberly Salas. Although the ambulance was not operating in an emergency capacity and had no lights or sirens activated, Salas ran a stop sign and the ambulance was struck broadside in a "T-bone" collision by one of defendant Waste Management's garbage trucks weighing about 70,000 pounds. The garbage truck was driven by defendant William Whitty. Approximately four hours later, Freed died at University of Michigan Hospital from injuries sustained in the accident.

On the second day of trial, before opening statements, plaintiff requested dismissal without prejudice of the two drivers, Salas and Whitty, as "named individual defendant[s] leaving their corporate employers in, . . . with the understanding that, that, obviously in no way waives a[n] agency/princip[al] relationship" and that "both employers would be vicariously liable, if in fact negligence is found by the jury." Healthlink's counsel stipulated regarding dismissal with prejudice as to Salas, but counsel for Whitty and his employer, Waste

Management, objected to dismissal of Whitty, unless it was with prejudice. Accordingly, trial commenced with Healthlink, Waste Management, and Whitty as defendants; Salas was dismissed.

Healthlink's counsel then disclosed "to the Court and all counsel of record" that Salas and Healthlink had entered into a "high-low" agreement and presented an unsigned copy to show its terms. The agreement provided that Salas would be dismissed and Healthlink would continue to be liable for her actions; that Salas would admit negligence and that her negligence was a proximate cause of Freed's death; that plaintiff would receive no less than $900,000 but no more than $1,000,000 from Healthlink; and that Healthlink was remaining in the case to argue the nature and extent of damages. Plaintiff's counsel noted that Healthlink's insurance policy had a coverage limit of $1,000,000, that there was no excess coverage, and that the case had been evaluated at $900,000 with regard to Healthlink and Salas. Plaintiff's counsel moved that the existence of the agreement not be revealed to the jury and Healthlink's counsel concurred. No position on the request was offered by counsel for Waste Management and Whitty.

At trial, the disputed issues appear to have been whether the garbage truck was being operated in excess of the speed limit or a reasonable speed, what percentage of fault to assign to the respective defendants, and whether Freed could feel pain or have knowledge of his injuries or impending death.

Before closing arguments, plaintiff's counsel again raised the issue of dismissing Whitty, but not Waste Management, stating:

> [I]n my complaint I alleged, not only that Waste Management was responsible for Mr. Whitty's driving under the doctrine of respondeat superior, but also I specifically

pled the owner's liability statute and during the course of discovery, Waste Management, of course, agreed and admitted that Mr. Whitty was driving in the course and scope of his employment with the expressed permission of Waste Management to drive a garbage truck.

So, unless there is some reason that they are now changing their position at trial, which I don't think they can, we could move to dismiss Mr. Whitty as a defendant . . . .

Counsel for Whitty and Waste Management indicated he had no objection "provided that it is with prejudice." Plaintiff's counsel stated that a dismissal with prejudice was acceptable "[a]s long as I have, I would like an admission from Waste Management that they are not asserting anything at all to the express—." At this point, however, the trial court cut plaintiff's counsel off and stated, "You don't need it," and told the bailiff, "You can bring in the jury." Thereafter, an order was entered dismissing Whitty with prejudice.

The jury ultimately found both Healthlink and Waste Management negligent, assigned fault at 55 percent and 45 percent, respectively, and awarded a total of $14 million to plaintiff resulting in an award of $6,529,353.70[1] against Waste Management. Waste Management then filed a multitude of postverdict and postjudgment motions seeking a new trial and a judgment notwithstanding the verdict (JNOV) on the basis of the same grounds now argued on appeal, all of which were denied.

II. ANALYSIS

A. RES JUDICATA

Waste Management first argues that the trial court erred by denying its motion for JNOV because plaintiff's dismissal of Whitty with prejudice should have

---

[1] This amount includes additional amounts for costs and interest.

resulted in the dismissal with prejudice of Waste Management on the basis of res judicata principles. We disagree.

First, we conclude that Waste Management waived this issue. At the time that the parties discussed Whitty's dismissal, Waste Management never suggested that Whitty's dismissal automatically resulted in its dismissal. Waste Management also never objected to the jury instructions that stated that the jury was to decide Waste Management's negligence; in fact, it specifically indicated satisfaction with the jury verdict form. If Waste Management believed that dismissal of Whitty resulted in Waste Management also being dismissed as a matter of law, it should have objected at the time of Whitty's dismissal, before the jury returned a verdict. In *Al-Shimmari v Detroit Med Ctr*, 477 Mich 280, 294-295; 731 NW2d 29 (2007), on which Waste Management relies, immediately after the trial court granted summary disposition to the physician, the hospital moved for summary disposition alleging that its dismissal was required as a result of the physician's dismissal. *Id.* at 286. Having failed to do likewise, Waste Management waived this argument. See *Phinney v Perlmutter*, 222 Mich App 513, 537; 564 NW2d 532 (1997) (stipulation to jury verdict form waived argument because "[e]rror requiring reversal cannot be error to which the aggrieved party contributed by plan or negligence").

Moreover, even at the hearing regarding the order dismissing Whitty, plaintiff's counsel stated that "[w]e're concerned about an argument by [defendant] on appeal that the dismissal of Whitty, i.e., the agent, relieves the principal, i.e. Waste Management, from any responsibility. Now we have it under ownership liability as well but that's what our concern is." Waste Manage-

ment again stood mute. If it believed that Whitty's dismissal precluded the claim against Waste Management, it should have so moved immediately after the trial court signed the order. It did not, however. Instead, it attempted to harbor this issue as a kind of appellate parachute; something this Court has long found impermissible. *Marshall Lasser, PC v George*, 252 Mich App 104, 109; 651 NW2d 158 (2002). Accordingly, Waste Management has waived this issue.

However, because this issue involves a question of law and the necessary facts have been presented, we will address the merits of Waste Management's argument. See *Laurel Woods Apartments v Roumayah*, 274 Mich App 631, 640; 734 NW2d 217 (2007).

Plaintiff argued that Waste Management was liable for any negligence by Whitty "based on the doctrine of Respondeat Superior as well as the Owner's Liability Act[,] § MCL 257.401." MCL 257.401(1) provides:

> This section shall not be construed to limit the right of a person to bring a civil action for damages for injuries to either person or property resulting from a violation of this act by the owner or operator of a motor vehicle or his or her agent or servant. The owner of a motor vehicle is liable for an injury caused by the negligent operation of the motor vehicle whether the negligence consists of a violation of a statute of this state or the ordinary care standard required by common law. The owner is not liable unless the motor vehicle is being driven with his or her express or implied consent or knowledge. It is presumed that the motor vehicle is being driven with the knowledge and consent of the owner if it is driven at the time of the injury by his or her spouse, father, mother, brother, sister, son, daughter, or other immediate member of the family.

Plaintiff argues that this statute provides that recovery may be had against the owner of the vehicle regardless of whether the driver of the vehicle has been dismissed.

Initially, the liability of owners was based on respondeat superior. In *Geib v Slater*, 320 Mich 316; 31 NW2d 65 (1948), the plaintiff's decedent was struck by an automobile owned by the defendant. The plaintiff predicated his right to recover "solely on the statute which imposes liability upon the owner of a motor vehicle for negligence of persons operating it with his consent." *Id.* at 318. The *Geib* Court concluded that the defendant was "guilty of no tortious act" but that "his liability arises only by operation of law. . . . [H]is statutory liability is based upon the doctrine of *respondeat superior.*" *Id.* at 321 (italics in original). It noted that "a valid release of either the master or servant from liability for tort operates to release the other" such that the settlement and release from the driver served to release the owner of the vehicle. *Id.*

Not long after, however, our Supreme Court overruled this conclusion. In *Moore v Palmer*, 350 Mich 363; 86 NW2d 585 (1957), our Supreme Court reexamined the owner's liability statute. It noted that in cases "where the owner of the automobile was also the employer of its driver, some confusion has developed as to whether the Court should apply the terms of [the] owner liability statute or the older common-law doctrine of master and servant." *Id.* at 375. It noted the *Geib* decision had indicated that the owner's liability was based on the doctrine of respondeat superior. *Id.* at 389. However, it concluded that liability under the owner's liability act "is not limited by the common-law tests applicable to the master-servant relationship" and expressly overruled the language in *Geib* that held that the owner's liability act was based on respondeat superior. *Id.* at 393-394.

Waste Management relies upon *Theophelis v Lansing Gen Hosp*, 430 Mich 473; 424 NW2d 478 (1988), a

medical malpractice case where our Supreme Court was asked to determine whether an amendment to the statute requiring contribution among tortfeasors "abrogated the common-law rule that settlement with, and release of, an agent operates to discharge the principal from vicarious liability for the agent's acts." *Id.* at 476. Although *Theophelis* cited *Geib* for common-law principles of agency, it did not indicate that it was overruling *Moore.* That is, its reference to *Geib* did not somehow reinvigorate the notion that owner liability was something other than a statutory creature and not based on common-law agency or respondeat superior. Indeed, "[t]he owner's liability under the statute is nonderivative" and "[t]he purpose of this statute is to place the risk of damage or injury on the person who has the ultimate control of the motor vehicle as well as the person in immediate control." *Poch v Anderson*, 229 Mich App 40, 52; 580 NW2d 456 (1998). See also *Hashem v Les Stanford Oldsmobile, Inc*, 266 Mich App 61, 80; 697 NW2d 558 (2005) (concluding that liability under the owner's liability statute is not vicarious in nature); *North v Kolomyjec*, 199 Mich App 724, 725-726; 502 NW2d 765 (1993) (the owner's liability act "created a new cause of action against a motor vehicle owner" and "the statute was designed to extend and complement the common law").

Waste Management also relies on the statement in *Kaiser v Allen*, 480 Mich 31; 746 NW2d 92 (2008), that liability between the owner and driver is vicarious and indivisible. *Id.* at 36, 38, 39. However, the issue in *Kaiser* concerned joint and several liability, not res judicata. In *Kaiser*, the plaintiff sued both the driver and the owner. *Id.* at 33-34. The plaintiff settled with the owner for $300,000 and the owner was dismissed from the lawsuit. *Id.* at 34. At trial, the jury concluded that "the total amount of damages suffered" by the

estate was $100,000. *Id.* The driver then requested that
the $100,000 be set off against the $300,000 already
paid by the owner. *Id.* Our Supreme Court concluded
that the setoff was appropriate because "the jury ver-
dict awarding damages to plaintiff explicitly states that
the award is for 'the total amount of damages' suffered
by the plaintiff" and that if the plaintiff were permitted
to recover $100,000 from the driver and keep the
$300,000 from the owner, the plaintiff would have
impermissibly recovered "four times more than the jury
determined plaintiff should be awarded . . . ." *Id.* at
39-40.

Thus, when the Supreme Court stated that fault was
"indivisible" in *Kaiser*, it was doing so in the context of
quantifying damages in order to make certain that the
plaintiff only received one full award, as provided by
law. The intent of *Kaiser* was to prevent a double
recovery by requiring a setoff even though statutory
changes had eliminated common-law joint and several
liability. *Kaiser* requires that if a plaintiff settles with
and dismisses a driver, the owner be given a setoff for
that settlement, not that the owner is entitled to a
complete dismissal. Indeed, Kaiser makes no reference
at all to res judicata.

Waste Management's reliance on medical malprac-
tice cases fails to consider the differences between the
relationships that result in hospital liability versus
vehicle owner's liability. Hospital liability is built on
common-law agency principles. See *Cox v Flint Bd of
Hosp Managers*, 467 Mich 1, 12; 651 NW2d 356 (2002).
However, Michigan caselaw is clear that such agency
principles do not control vehicle owner's liability. See
*Roberts v Posey*, 386 Mich 656, 664; 194 NW2d 310
(1972) ("The owner's liability statute is too important a
foundation stone in the field of automobile-negligence

law to be circumscribed by judicially declared limitations borrowed from the law of agency."). Indeed, the entire basis for the creation of the statute was that common-law concepts of bailment, agency, and respondeat superior were inadequate. *Frazier v Rumisek*, 358 Mich 455, 457; 100 NW2d 442 (1960), citing *Moore*, *supra*. Given that the underlying relationship that results in liability of a hospital is agency, and agency law is inapplicable to the owner's liability statute, we conclude that the holdings of *Al-Shimmari*, which are clearly based on an agency relationship, are not applicable in the vehicle owner's liability context.

We recognize that in this case Whitty was an employee of Waste Management, creating an additional relationship besides that of owner/driver. However, because we have concluded that plaintiff's owner's liability claim survived Whitty's dismissal, thereby providing a valid basis for upholding the jury's award, we need not address whether dismissal was required because of Whitty and Waste Management's agency relationship. In doing so, we hold that even when dismissal of a vicariously liable defendant is appropriate based on agency principles, it will not preclude a plaintiff's claim or recovery against that defendant based on the vehicle owner's-liability statute where such a claim has been pleaded. Accordingly, the trial court did not err by denying Waste Management's motion for JNOV.

### B. HIGH-LOW AGREEMENT

Waste Management next argues that the trial court erred by denying its motion for a new trial that alleged that the trial court erred by failing to disclose the high-low agreement between plaintiff and Healthlink to the jury. We disagree.

The high-low agreement in this case provided that Salas would be dismissed with prejudice, that Healthlink would be liable for all of Salas's actions, and that Healthlink would admit negligence and that its negligence was a proximate cause of Freed's death. In exchange, plaintiff would receive no less than $900,000 and no more than $1,000,000, with the jury award determining the amount received ($900,000 or less would result in payment of $900,000; $1,000,000 or more would result in payment of $1,000,000; an amount between $900,000 and $1,000,000 would result in payment of the jury verdict). A verdict against Healthlink was not to be entered as a judgment; instead a release and settlement agreement would "be the only mechanism of resolution of the litigation," with both parties waving all rights to appeal.

As previously noted, the agreement was disclosed to both the trial court and counsel on the second day of trial, before opening statements. Plaintiff's counsel moved that "there be no mention of the hi/low agreement in this case" and requested an order limiting and precluding mention of the agreement. He added, "There is no agreement between plaintiff and these defendants to prevent them from asserting any defense that they want against us, against Mr. Whitty and/or Waste Management." Healthlink's counsel stipulated with respect to the request. Waste Management's counsel neither agreed nor objected, but remained silent.

After trial, when Waste Management filed its motion for a new trial on the ground that the jury was not informed of the high-low agreement, the trial court held that it was not required to inform the jury of a high-low agreement where no party asked that it do so during the entire trial. Waste Management argued that the trial court had a duty to disclose it sua sponte because it was a matter of public policy and judicial integrity, and that a request in a post trial motion was sufficiently timely.

Waste Management also argued that there was litigation cooperation. The trial court concluded:

> The Court of Appeals and whoever reads this record should know that I had nothing to do with the agreement that was entered into. Nobody asked me to disclose it. I would never have sua sponte decided to disclose it. And as far as I'm concerned, Waste Management waived any argument that [defense counsel] is now making. That's the last word.

As noted by the trial court, Waste Management never objected to plaintiff and Healthlink's request that the agreement not be disclosed to the jury. "A party may not waive objection to an issue and then argue on appeal that the resultant action was error." *Bonkowski v Allstate Ins Co*, 281 Mich App 154, 168; 761 NW2d 764 (2008). Additionally, even assuming, as Waste Management's appellate counsel suggests, that Waste Management's trial counsel was caught off guard by the disclosure of the agreement on the second day of trial, at no time during the 16 days of trial[2] did Waste Management's trial counsel ever attempt to argue that disclosure of the agreement should have been granted, or that it even wanted the agreement disclosed. We conclude that Waste Management had more than sufficient time during trial to consider the agreement and raise the issue of disclosure to the jury at a time when the trial court still had the opportunity to do so. Thus, Waste Management's failure to object before the jury was given the case, whether by plan or negligence, cannot constitute reversible error. *Phinney, supra* at 537.

As before, however, because this issue involves a question of law and the relevant facts are contained in the record, we have chosen to address the merits of Waste Management's argument. *Laurel Woods Apartments, supra.*

---

[2] Trial began on April 25 and ended on May 10.

## 1. *MARY CARTER* AGREEMENTS

First, we disagree with Waste Management that the agreement at issue is a *Mary Carter* agreement. A *Mary Carter*[3] agreement is defined as

> [a] settlement device used in multiparty litigation. Under the typical Mary Carter agreement the plaintiff releases his cause of action against a joint tortfeasor in return for the settling joint tortfeasor's continued participation in the trial. *The plaintiff also promises to pay the settling tortfeasor a portion of the recovery received from the nonsettling tortfeasor.* The settling tortfeasor thus represents himself to be a defendant whose financial interest is adverse to the plaintiff, while in fact he has a vested financial interest in the success of the plaintiff's cause of action against the nonsettling defendant. [Black's Law Dictionary (5th ed) (emphasis added).]

Under this definition, the agreement does not constitute a *Mary Carter* agreement because plaintiff did not promise to pay Healthlink a portion of the recovery received from Waste Management.

In *Smith v Childs*, 198 Mich App 94; 497 NW2d 538 (1993), this Court stated that

> [t]he distinguishing characteristics of a *Mary Carter* agreement are that it (1) not act as a release, so the agreeing defendant remains in the case, (2) is structured in a way that it caps the agreeing defendant's potential liability and gives that defendant an incentive to assist the plaintiff's case against the other defendants, and (3) is kept secret from the other parties and the trier of fact, causing all to misunderstand the agreeing defendant's motives. [*Id.* at 97-98.]

The agreement in this case only satisfies the first element, because Healthlink was not released, but was left in the

---

[3] *Booth v Mary Carter Paint Co*, 202 So 2d 8 (Fla App, 1967).

case to argue fault and damages. Although the agreement capped Healthlink's liability, it did not give Healthlink an incentive to "assist the plaintiff's case against the other defendants . . . ." Although Healthlink did agree with plaintiff about Waste Management's negligence and fault, this was not a position created by the agreement, but was the result of the natural alignment of the parties under the facts of this case. Regardless of the high-low agreement, Healthlink had an undeniable interest in Waste Management also being found at fault because the higher the degree of fault found by the jury as to Waste Management, the lower the amount of fault assignable to Healthlink.

Waste Management relies, in part, on a cost-sharing agreement related to accident reconstructionist Weldon Greiger's testimony. According to a letter sent May 7, 2007, from Healthlink's counsel to plaintiff's counsel, plaintiff's counsel's firm "agreed to pay for the fees and expenses related to Greiger's preparation for trial since April 25, 2007 and Mr. Greiger's trial appearance" for Healthlink's case-in-chief. This is not evidence of improper collusion, however. Greiger was an independent expert originally hired by Healthlink and plaintiff determined that Greiger's testimony was helpful to its case. Rather than risk Healthlink not calling Greiger because his testimony matched that of plaintiff's expert, plaintiff elected to share in the payment of Greiger's fee. This agreement is no different than those situations where co-defendants or co-plaintiffs cost-share fees of experts on certain issues where they have a unity of interest on that issue. Here, Healthlink and plaintiff had a unity of interest in proving Waste Management was at fault. This interest existed independently of the high-low agreement and was obvious throughout the trial. Thus, we are not

persuaded that the cost-sharing agreement related to Greiger is evidence of collusion.[4]

Finally, the third factor is not met because the agreement was not kept secret from the other parties and the alignment of the parties was self-evident throughout the case and was consistent with the alignment, if any, that the high-low agreement created. Throughout the trial, Healthlink's interests remained clear to the parties, the court and the jury, i.e., Healthlink sought to reduce the gross amount of damages awarded and to reduce its percentage of fault, which given that plaintiff had no fault, inherently meant that Healthlink would seek to increase Waste Management's percentage of fault.

Thus, whether using the Black's Law Dictionary definition or this Court's own standard, the agreement is not a *Mary Carter* agreement. This conclusion is not dispositive of the issue, however, because the agreements in *Hashem* were also "not prototypical *Mary Carter* agreements." *Hashem, supra* at 83.

### 2. THE AGREEMENTS IN *HASHEM*

The agreements in *Hashem* were three high-low agreements executed between the plaintiff and each of three of the defendants. *Id.* at 81-82. One provided for a minimum award of $25,000 and a maximum award of $50,000; one provided for a minimum of $90,000 and a maximum of $100,000 (the insurance policy limit for that defendant); and the third provided that the plaintiff would receive that defendant's insurance policy limit as both the high and low amount. *Id.* Counsel for

---

[4] Waste Management suggests other examples of what it claims was collusion during voir dire and closing argument. A review of the record reveals that these suggestions are merely speculative and that the events were of little significance to the trial or its outcome.

the two remaining defendants had "questioned the propriety of the continued participation of the settling codefendants without disclosure of the agreements to the jury" but the trial court declined, finding the agreements irrelevant. *Id.* at 82. The nonsettling defendants then argued on appeal that the failure to inform the jury of those agreements denied them a fair trial. *Id.* This Court noted that the agreements did not fall precisely into the definition of a *Mary Carter* agreement because they were not kept secret from the trial court and the nonsettling defendants and they contained no releases. *Id.* at 83.

> Nonetheless, as argued by defendants, an agreement that deprives a settling defendant of any significant financial interest in the amount recovered against any nonsettling defendant distorts the adversarial process and potentially undermines both the right to a fair trial and the integrity of the judicial system. . . .
>
> [T]he primary danger of such an agreement is that the settling defendant will fail to operate as an adversary. . . . [This danger] may also be present, although in a subtler form, when a defendant has reached a "high-low" agreement, yet remains involved in the litigation. With respect to these latter agreements, the distortion of the adversarial process is arguably less pronounced because, given the range of awards provided for in a "high-low" agreement, the settling defendants retain an interest in ensuring that the total amount of damages is as small as possible. Nonetheless, the integrity of the judicial system is placed into question when a jury charged with the responsibility to determine the liability and damages of the parties is denied the knowledge that there is, in fact, an agreement regarding damages between a number of the parties. Consequently, wise judicial policy must favor disclosure of such agreements to the jury. [*Id.* at 83-85 (citation omitted).]

The agreement in this case is similar to those involved in *Hashem*. The agreements in both cases were dis-

closed to all parties and the trial court, but not the jury; did not contain a release, leaving the settling parties to continue to participate in the litigation; and contained minimum and maximum amounts, where the maximum was generally the defendant's insurance policy limit. Thus, *Hashem* appears applicable to the present case.

The *Hashem* Court concluded that "the interest of fairness served by disclosure of the true alignment of the parties to the jury must be weighed against the countervailing interests in encouraging settlements and avoiding prejudice to the parties." *Id.* at 86. It noted that the variation of agreements in this area was "virtually limitless" so that "parties must rely on the sound discretion of the trial court to ensure that, whatever the circumstances of a particular case, the integrity of the adversarial process is preserved." *Id.* Accordingly, we must determine whether the trial court abused its discretion by failing to disclose the agreement to the jury.

We note that none of the parties requested that the jury be informed of the agreement. In fact, the only motion in front of the trial court was a specific request that the jury not be informed of the agreement. Thus, it is difficult to see an abuse of discretion.

Waste Management argues that the trial court had an obligation to disclose sua sponte the agreement. We find nothing in the language of *Hashem* that mandates disclosure of all high-low agreements. Moreover, even if we assume that the trial court has some type of obligation to act sua sponte, the trial court's obligation is not to disclose the agreement, but "the duty and the discretion to fashion procedures that ensure fairness to all the litigants in these situations." *Id.* at 86. The purpose of the disclosure of the agreement would be to ensure the integrity of the judicial system. *Id.* at 84-85.

In this case, we find that there is no evidence that nondisclosure of the agreement undermined the integrity of the judicial process. As noted previously, Healthlink's position at trial remained unchanged by the agreement. It had a vested interest in reducing plaintiff's total damages and in allocating fault to Waste Management, and all its actions during trial clearly reflected this position. Thus, the jury and the parties were all aware of the true alignment of the parties.

Additionally, although the nature of the *Hashem* agreements and the agreement in this case is similar, the amount still at stake was substantially different. In *Hashem*, the three high-low agreements provided for a total difference of $35,000 between the low and high figures, averaging slightly more than $10,000 for each settling defendant. *Id.* at 81-82. Further, in *Hashem*, one of the three settling defendants had no change in liability regardless of the outcome of the trial, because the high and low amounts were the identical insurance policy limit. *Id.* In the present case, the difference between the low and high figures was $100,000—almost 10 times the average amount at issue in *Hashem*. To the degree that Waste Management suggests that $100,000 is an insufficient sum to create an incentive, we note that Waste Management elected to go to trial rather than raise its settlement offer to plaintiff from its offer of $375,000 to plaintiff's demand of $500,000—a difference of $125,000. Since Waste Management deemed $125,000 sufficient incentive to go to trial, it is difficult to understand its present claim that $100,000 was not a sufficient stake for Healthlink to have been considered adverse to plaintiff.

Finally, *Hashem* makes clear that disclosure of a high-low agreement must be balanced against the legal traditions of encouraging settlements and avoiding

prejudice by revealing settlements to juries. *Id.* at 86. Indeed, encouraging settlement and the potential prejudice caused to parties when such agreements are disclosed to juries is the foundation of MRE 408, which excludes evidence of "accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim . . . ." This was discussed at length in *Brewer v Payless Stations, Inc*, 412 Mich 673; 316 NW2d 702 (1982), which generally barred informing jurors of settlements. See, also, *Precopio v Detroit*, 415 Mich 457, 473; 330 NW2d 802 (1982) ("public policy . . . encourages settlements, a policy which underlies the exclusion of offers to settle or to compromise from consideration by the factfinder on the issue of liability").

In *Brewer*, the Supreme Court noted that disclosure of such agreements is a "two-edged sword" and that either or both parties may prefer that a jury not be informed of it. *Brewer, supra* at 678. Our Supreme Court unanimously wrote that informing juries of settlements

> cuts both ways. . . . For example, the mere fact of settlement by a codefendant could suggest liability on the part of a blameless non-settling defendant. The amount of the settlement, if large, might tend to suggest a higher value of the claim. If small, the jury might tend to "make it up" by a higher verdict as to the non-settling tortfeasor. . . .
>
> On the other hand, a small settlement could disadvantage a plaintiff if the jury perceived that amount as bearing on the total value of the claim. The jury also might consider its duty to be diminished by settlement or consider the amount involved to be adequate regardless of the non-settling defendant's liability. [*Id.*]

It is in this context that we consider Waste Management's failure to timely request that the high-low agreement be disclosed. It seems likely that Waste

Management did not request disclosure as a matter of trial tactics, because revealing the agreement could have been prejudicial to Waste Management's position. Because Waste Management had been unwilling to settle for $500,000, it had no desire for the jury to hear that Healthlink was going to pay plaintiff a minimum of $900,000, thus suggesting to the jury that the damages in the case were far greater than Waste Management claimed.

In any event, because the jury was aware of the true alignment of the parties and Healthlink had a substantial interest in the outcome of the trial, we conclude that, even if the trial court had performed the balancing test, it would not have required disclosure of the agreement. Accordingly, the trial court did not abuse its discretion by failing to disclose the agreement to the jury or by denying a new trial on such grounds.

### C. EVIDENCE OF PAIN AND FEAR

Waste Management argues that plaintiff did not provide evidence of conscious pain and suffering and that the trial court's ruling that permitted plaintiff's expert witness Dr. Werner Spitz to testify that Freed "could have" experienced a fear of death should have resulted in JNOV or a new trial because it violated the preponderance of the evidence standard. We disagree with both propositions.

We review de novo a trial court's decision to deny a motion for JNOV. *Craig v Oakwood Hosp*, 471 Mich 67, 77; 684 NW2d 296 (2004). The evidence is reviewed and all legitimate inferences are taken in the light most favorable to the nonmoving party. *Id.* "Only when the evidence viewed in this light fails to establish a claim as a matter of law is the moving party entitled to judgment

notwithstanding the verdict (JNOV)." *Id.* (quotation marks and citation omitted).

It was uncontested that Freed's injuries were severe, including the internal injuries that ultimately caused his death, a leg fractured at about 90 degrees, and multiple, less significant injuries. It is not disputed that these are injuries that in a conscious person would obviously cause pain and suffering. Freed's physical medicine and rehabilitation physician of several years, Dr. Edward Dabrowski, testified that, despite his quadriplegia, Freed "had sensation" and could see, hear, and feel pain. He testified that in his opinion Freed would have felt pain from the injuries he suffered in this accident. More generally, he testified about Freed's capacity to experience sensations and emotions. He testified that Freed would grimace in response to pain, smack his lips in response to the presence of his mother, move his eyes, recognize individuals, experience pleasure in interactions both with people and with his environment, and that Freed enjoyed therapeutic recreational activities such as watching baseball, which he "loved," and going to the park. He also testified that Freed could respond with volitional movement to an order to squeeze the doctor's hand.

Eyewitness testimony about Freed's pain and state of mind after the accident came from Kelly Barker, a physician assistant who treated Freed for four years before the accident and who came to the accident scene shortly after the crash. She testified about both her observations post-accident as well as to her evaluation of Freed's sensorium in general. Like Dabrowski, Barker testified that Freed would respond to pain by grimacing, respond to his parents, smile or giggle if happy, respond to changes in his environment, had full facial expressions, and could respond to simple commands such as squeezing a hand.

Barker testified that she received a call about the accident and arrived at the scene after Freed had been placed on a stretcher. She testified that Freed appeared frantic and traumatized, with his eyes wide-open, and that this appearance was not how he normally appeared. She described him as maintaining full eye contact with her at the scene and looking scared. She testified that she responded to him with his facial expressions and that he was not unconscious. She testified that she conducted a physical examination and found that Freed had a 90-degree fracture to one leg, was bleeding from multiple cuts, and displayed bruising that demonstrated internal bleeding. She testified that she traveled in the ambulance with Freed to the local hospital and remained with him the entire time he was in the emergency department, and that during that time he remained conscious and his facial expressions were frantic and scared.[5] She further testified that after about 45 minutes, Freed was transferred from that emergency room by ambulance to University of Michigan Hospital and that she remained with him during the ambulance ride and for some time at University of Michigan Hospital. She testified that during this period as well, Freed remained conscious throughout and that his facial expressions continued to show fear. She testified that before Freed went to the CT scanner—at which point she left the hospital—she spoke to him and that his eyes were open and he was listening to her.

The defendants did not claim that Freed's injuries would not have been painful or that the experience would not have been extremely frightening to a person

---

[5] Given his preexisting injuries, Freed could not utter words describing his experience. However, "[t]he existence of a decedent's conscious pain and suffering may be inferred from other evidence that does not explicitly establish the fact." *Byrne v Schneider's Iron & Metal, Inc*, 190 Mich App 176, 180; 475 NW2d 854 (1991).

with an operative sensorium. Rather, both Healthlink and Waste Management argued that Freed was incapable of feeling pain or fear in light of cognitive and sensory limits created by his preexisting injuries. They offered the testimony of a retained neurologist who reviewed Freed's records and offered this opinion and stated that, given that conclusion, Barker's eyewitness observations were not meaningful. By contrast, as just discussed, plaintiff submitted evidence from Dabrowski and Barker that Freed was, in fact, capable of experiencing pain and fear despite his preexisting injuries and that his facial expressions were easy to read.

Plaintiff also offered the testimony of a retained expert, Dr. Werner Spitz, whose review of the records and the testimony of Dabrowski and Barker led to his opinion that Freed could sense and feel pain. Spitz also testified that Freed's capacity to experience pleasure was demonstrative of an ability to feel displeasure and fear. He also testified that Freed's symptoms after the crash indicated that he was not getting adequate oxygen due to his internal bleeding and that lack of oxygen instinctively causes fear.

Taking this evidence in the light most favorable to plaintiff, the collective testimony of Dabrowski, Barker and Spitz meant that Freed had the ability and capacity to feel pain, and that his facial expressions evidenced pain and fear. Although the jury was presented with a differing view on these issues by defendants' expert, it is the role of the jury to determine which witnesses it found credible and what weight to give the various evidence. *Taylor v Mobley*, 279 Mich App 309, 314; 760 NW2d 234 (2008). Because there was sufficient evidence from which the jury could conclude that Freed had a fear of impending doom or death and conscious pain and suffering, we find no error in the trial court's denial of Waste Management's motion for a JNOV.

Waste Management argues that the trial court erred by allowing Spitz to testify about what Freed "could have" experienced. We are not, however, persuaded that this is error. As noted, defendants argued that Freed lacked the capacity to interact with his environment and, therefore, could not have had a fear of death. Spitz's testimony was intended to counter that view. His testimony was that Freed "could have" had such a fear, meaning Freed had the capacity to have such a state of mind or experience.[6] Although Spitz's testimony by itself would not have been enough to prove actual pain and suffering and without Barker's eyewitness testimony would have been merely speculative, it did not stand alone. Rather, it complemented Barker's statements regarding her observations of, and interactions with, Freed after the accident. Thus, allowing testimony from Spitz that Freed "could have" had certain experiences was not error.

---

[6] The dissent selects several statements from Spitz's testimony that it asserts went beyond the issue of Freed's capacity to experience pain and fear. However, this mischaracterizes the statements. Several of the quoted statements were that Freed "could have," i.e., Freed had the capacity to experience pain and fear. Several others went to the fact that loss of blood causes brain hypoxia (reduced oxygen), which causes a sensation of fear and impending doom regardless of an individual's intellectual status. The other statements were medical opinions based upon observations of Freed at the accident scene by a physician assistant familiar with Freed. The dissent does not explain why it concludes that such observations are not sufficiently reliable for a medical expert to rely on them. Medical experts routinely rely on the observations of physician assistants and nurses. Indeed, the dissent itself does not take issue with admission of the testimony of the physician assistant witness. Of course, the jury was free to disregard that testimony and, if it did, to disregard the opinions of Dr. Spitz based upon it. Finally, although the dissent concludes that Dr. Spitz's testimony constituted "improper and repetitive references" to damages, it appears untroubled by the defense expert's repeated assertions that the decedent "was not in pain at the time after the injury and he didn't know how serious his injuries were."

D. JURY INSTRUCTIONS

Waste Management alleges that the trial court improperly paraphrased state statutes when giving M Civ JI 12.01 and erred by failing to give a sudden emergency instruction. We disagree.

Claims of instructional error are reviewed de novo, *Kenkel v Stanley Works*, 256 Mich App 548, 555-556; 665 NW2d 490 (2003), but the determination whether an instruction is accurate and applicable is reviewed for an abuse of discretion. *Stevens v Veenstra*, 226 Mich App 441, 443; 573 NW2d 341 (1997). "Jury instructions should include all the elements of the plaintiff's claims and should not omit material issues, defenses, or theories if the evidence supports them." *Keywell & Rosenfeld v Bithell*, 254 Mich App 300, 339; 657 NW2d 759 (2002) (citations and quotation marks omitted). Reversal based on instructional error is only warranted where "failure to vacate the jury verdict would be inconsistent with substantial justice." *Cox, supra* at 8 (citation and quotation marks omitted).

1. NEGLIGENCE INSTRUCTIONS

Counsel for all parties and the trial court had a several page colloquy regarding the giving of M Civ JI 12.01. They reviewed what possible statutory violations would be referenced and as to which defendants. Plaintiff requested that the jury be given M Civ JI 12.01 as to Waste Management and that part or all of five statutes be paraphrased in this instruction, namely, MCL 257.626 (reckless driving), MCL 257.626b (careless driving), MCL 257.627 (driver shall operate at a careful and prudent speed, keep a proper lookout and shall not operate at a speed that will not allow for a stop within the assured clear distance ahead) and MCL 257.628 and

257.629 (exceeding posted speed limit). Waste Management objected to all of plaintiff's requests. The trial court held that there was no evidence to support an instruction on the statute dealing with reckless driving, but held that the jury should be given M Civ JI 12.01 as to careless driving, proper lookout, excess speed for conditions, and exceeding posted speed limit.

Waste Management and plaintiff both requested that M Civ JI 12.01 be given as to Healthlink with regard to possible violations of multiple statutes. Healthlink objected on the grounds that such instructions were not necessary because it had already admitted negligence. The trial court overruled the objection and gave the instructions as requested.

Waste Management has not argued on appeal that the trial court erred by agreeing to include any of the cited statutes in M Civ JI 12.01. Rather, Waste Management argues only that the trial court did not accurately paraphrase the relevant statutes and that the trial court's inaccuracies were so extensive that the outcome of the trial was affected.

Because Waste Management has not supplied this Court with a copy of the instructions that it requested and there does not appear to be a copy of any such requested instructions in the record, we presume that Waste Management concurred with the form used by the trial court in its M Civ JI 12.01 instruction as to Healthlink, which was essentially identical in form to the M Civ JI 12.01 instruction given as to Waste Management. The only difference in the instructions with regard to the two defendants is that the trial court advised the jury of several possible statutory violations by Healthlink that it did not include as to Waste Management, specifically, failure to stop in the assured clear distance, failure to stop at a stop sign and failure

to yield. This difference in substance appears to have been proper given the facts of the case and theories of the parties.

The trial court referenced differing statutes for the two defendants when instructing the jury under M Civ JI 12.01. The instructions read:

> We have state statutes that provide concerning the negligent driving of a garbage truck in a careless and negligent manner, concerning negligent failure to keep a proper lookout, concerning negligent driving of the garbage truck in excess of the posted speed limit and too fast for existing weather and road conditions.
>
> We have state statutes that further provide concerning negligent driving of an ambulance in a careless and negligent manner, negligent failure to stop in an insured [sic] clear distance, negligent failure to keep a proper lookout, negligent driving of an ambulance at a speed contrary to weather and road conditions, negligent failure to obey stop signs, to obey signs such as a stop sign, negligent failure to yield to a vehicle who had the right of way.
>
> * * *
>
> If you find that the Defendants violated any of these statutes before or at the time of the occurrence, you may infer that that Defendant was negligent. You must then decide whether such negligence was a proximate cause of this occurrence.

Looking at the form of the paraphrasing of the instructions, we find no error as to Waste Management. MCL 257.626b provides that "[a] person who operates a vehicle upon a highway . . . or other place open to the general public . . . in a careless or negligent manner likely to endanger any person or property, but without wantonness or recklessness, is responsible for a civil infraction." The portion of MCL 257.627(1) unrelated to assured clear distance provided at the relevant time:

"A person driving a vehicle on a highway shall drive that vehicle at a careful and prudent speed not greater than nor less than is reasonable and proper, having due regard to the traffic, surface, and width of the highway and of any other condition then existing." Finally, MCL 257.628(8) provided at the relevant time that "[a] person who fails to observe an authorized speed or traffic control sign, signal, or device is responsible for a civil infraction." See also MCL 257.629(6).

The paraphrases "negligent driving of a garbage truck in a careless and negligent manner" and "negligent driving of the garbage truck in excess of the posted speed limit and too fast for existing weather and road conditions" do convey the nature of those statutes. Although the instructions might have been more clear if the trial court had included the words "is prohibited" so that the instructions read that Michigan has statutes "which provide that negligent driving of a garbage truck in a careless and negligent manner [is prohibited] . . . [and n]egligent driving of the garbage truck in excess of the posted speed limit and too fast for existing weather conditions [is also prohibited]," ultimately, the paraphrasing cannot be said to have been so poor that a jury could not conclude what was being asked of it. Also, Waste Management was satisfied with this paraphrasing when it came to Healthlink. Although the trial court's paraphrasing was awkward, it remained accurate and we do not see how a more artful reading of the instruction would have affected the outcome of the case.

2. SUDDEN EMERGENCY INSTRUCTION

The sudden emergency instruction is set forth at M Civ JI 12.02. M Civ JI 12.02 is captioned "Excused Violation of Statute" and, if given, is to be read immediately after the reading of M Civ JI 12.01, which, as just noted, sets forth claims that the defendant violated a

state statute from which negligence may be inferred.
Waste Management seems to suggest that M Civ JI 12.02
must be given in all vehicle negligence cases and that it
provides an excuse for negligence altogether. However, the
plain language of M Civ JI 12.01 and 12.02 make clear
that M Civ JI 12.02 is not to be given in all negligence
cases or as to all claims of negligence and that it is not
intended to excuse negligence as such. Rather, it is in-
tended to allow a jury to excuse the violation of a statute
from which negligence may be inferred and may only be
given as regards any statutory violations referenced in M
Civ JI 12.01.

   M Civ JI 12.02 provides:

   However, if you find that *[defendant/plaintiff]* used
   ordinary care and was still unable to avoid the violation
   because of [State here the excuse claimed.], then *[his/her]*
   violation is excused.

   If you find that *[defendant/plaintiff]* violated this statute
   and that the violation was not excused, then you must decide
   whether such violation was a proximate cause of the occur-
   rence.

   As noted, as to Waste Management, the trial court read
M Civ JI 12.01 and inserted paraphrases regarding state
statutes barring driving in excess of the speed limit,
driving too fast for existing weather and road conditions,
careless driving, and failing to keep a proper lookout.

   "The sudden-emergency doctrine applies when a colli-
sion is shown to have occurred as the result of a sudden
emergency not of the defendants' own making." *White v
Taylor Distributing Co, Inc*, 482 Mich 136, 139-140; 753
NW2d 591 (2008) (quotation marks and citation omitted).
A case exemplifying the application of M Civ JI 12.02 is
*Vsetula v Whitmyer*, 187 Mich App 675, 677-678; 468
NW2d 53 (1991). In that case, the jury was instructed on
the defendant's alleged violation of MCL 257.652, the

statute requiring a driver to stop and yield before entering a highway from a driveway. The defendant testified that she did brake, but that her car hit a patch of ice on the driveway that sent her car sliding onto the highway despite the fact that she had timely applied her brakes. This Court held that the trial court erred by directing a verdict on the issue of negligence in favor of the plaintiff and opined that the jury should have been given the sudden emergency instruction. In that case, there was no claim that the defendant was speeding before her attempt to brake; in fact, the uncontested testimony was that she had been traveling at only two to three miles per hour.

Waste Management was not entitled to a sudden emergency instruction with regard to its alleged excessive speed because the garbage truck's exceeding the speed limit or going too fast for conditions preceded, rather than was caused by, the ambulance's running the stop sign. The same is true of the Waste Management's driver's duty to keep a proper lookout.

Waste Management properly argued to the jury that even if its driver was speeding, or not keeping a reasonable lookout, these violations did not amount to a proximate cause of the accident because the ambulance darted out when there was no time to stop regardless of what speed Whitty was going. The jury was directed to consider this argument because it was instructed under M Civ JI 12.01 that, even if it found that Waste Management had violated a statute and was therefore negligent, it still "must decide whether such violation was a proximate cause of the occurrence."[7]

---

[7] We note, however, that Waste Management's proximate cause argument was weak given that Waste Management did not present any expert testimony to rebut the three accident reconstructionists who testified that Whitty was speeding and that the accident would not have occurred had he been traveling within the speed limit.

The sudden emergency doctrine provides a basis for a defendant to be excused of a statutory violation in regards to the events that occur after the defendant discovers the emergency. Here, plaintiff did not argue that Whitty failed to properly respond once he observed the ambulance in his path and plaintiff's experts did not criticize Whitty's reactions upon seeing the ambulance. Rather, plaintiff claimed that Whitty's speed before discovery of the emergency is what prevented him from being able to stop when he applied his brakes.

Waste Management asserts that anytime the trial court gives an M Civ JI 12.01 instruction on failure to stop within the assured clear distance ahead that the relevant defendant is entitled to a sudden emergency instruction. However, the record is clear that the trial court instructed the jury on assured clear distance only as to Healthlink and not as to Waste Management. Because no instruction was given that the jury could find Waste Management negligent merely because of a failure to stop within the assured clear distance ahead, the trial court properly declined to give a sudden emergency instruction as to Waste Management.[8] We find no abuse of discretion.

### E. CONSCIOUS PAIN AND SUFFERING/REMITTITUR

Waste Management argues that the trial court erred by denying its motion for remittitur because the jury's excessive award of $4 million for four hours of claimed, but unproven, conscious pain and suffering and $10

---

[8] The dissent suggests that not giving this instruction constituted an "assumption that Waste Management's driver was speeding." This is incorrect. The jury remained completely free to find that Waste Management's driver was not speeding before the emergency arose and to find for Waste Management on that basis. The decision not to give the sudden emergency instruction merely reflected the fact that plaintiff had not alleged any negligence by Whitty *after* the emergency arose. An instruction providing that postemergency negligence may be excused has no place where there is no allegation of postemergency negligence.

million for lost companionship were vastly beyond the proofs as reasonably construed. We disagree.

We review for an abuse of discretion a trial court's denial of a motion for remittitur. *Leavitt v Monaco Coach Corp*, 241 Mich App 288, 305; 616 NW2d 175 (2000). Remittitur is provided for under MCR 2.611(E)(1), which provides:

> If the court finds that the only error in the trial is the inadequacy or excessiveness of the verdict, it may deny a motion for new trial on condition that within 14 days the nonmoving party consent in writing to the entry of judgment in an amount found by the court to be the lowest (if the verdict was inadequate) or highest (if the verdict was excessive) amount the evidence will support.

Under this language, remittitur is justified when a jury verdict is excessive. *Palenkas v Beaumont Hosp*, 432 Mich 527, 531-532; 443 NW2d 354 (1989). However, "[b]ecause the amount required to compensate a party for pain and suffering is imprecise" and "that calculation typically belongs to the jury," reviewing courts must ensure "that a verdict is not 'excessive' without concomitantly usurping the jury's authority to determine the amount necessary to compensate an injured party." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 763-764; 685 NW2d 391 (2004). Thus, "appellate review of jury verdicts must be based on *objective* factors and firmly grounded in the record." *Id.* at 764 (emphasis in original). Our Supreme Court has indicated that the factors that should be considered by this Court are: (1) whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; (2) whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; and (3) whether the amount actually awarded is comparable with awards in similar cases both within the state and in other jurisdictions. *Id.*

Waste Management argues that the jury's award was improperly based on passion and sympathy because it responded to plaintiff's counsel's request that the estate be awarded $1 million for each hour Freed suffered.[9]

> An appellate court reviewing a trial court's grant or denial of remittitur must afford due deference to the trial judge since the latter has presided over the whole trial, has personally observed the evidence and witnesses, and has had the unique opportunity to evaluate the jury's reaction to the witnesses and proofs. Accordingly, the trial judge, having experienced the drama of the trial, is in the best position to determine whether the jury's verdict was motivated by such impermissible considerations as passion, bias, or anger. Deference to the trial judge simply reflects the recognition that the trial judge has observed live testimony while the appellate court merely reviews a printed record. [*Palenkas, supra* at 534.]

Because the trial court did not find any basis to determine that the jury was somehow inflamed or biased, and Waste Management points to nothing other than that single statement for its argument, Waste Management has failed to show the first element.[10]

We address the second and third factors together because they are related. Waste Management presents

---

[9] The dissent suggests that the combining of all past noneconomic damages in a single question on the verdict form was reversible error. In fact, that construction is used in all the personal injury standard verdict forms that address noneconomic damages. In addition, the trial court properly instructed the jury that it could award noneconomic damages only for "the pain and suffering undergone by Bretton Freed while he was conscious during the time between his injury and death" and for the loss of society and companionship suffered by his family as a result of his death. Finally, while Waste Management objected to the verdict form at trial, it has not argued on appeal that the trial court erred by overruling that objection.

[10] We also note that Waste Management did not object when plaintiff's counsel made this damages request in closing argument.

what it claims are analogous cases with much lower awards. However, plaintiff provided similarly analogous cases that tend to support the amount of the award. As noted by our Supreme Court, "no two cases precisely resemble one another" and "no two persons sustain the same injury or experience the same suffering." *Precopio*, *supra* at 471. Recognizing those issues, it held that "[a]n appellate court should not attempt to reconcile widely varied past awards for analogous injuries which in the abbreviated appellate discussion of them seem somewhat similar." *Id.* (citation and quotation marks omitted). Moreover, a dollar amount can never truly be placed on an individual's pain and suffering. *Phillips v Deihm*, 213 Mich App 389, 405; 541 NW2d 566 (1995).

In presenting comparable awards, Waste Management argues that "when a young man of similar age who was fully able bodied was killed, a Bench Judgment resulted in a $1.5 Million award." This argument implies that because an able-bodied young man did not receive an award as large as the one in this case, a quadriplegic certainly should not. Not only does this argument imply that able-bodied people's lives are worth more, it fails to recognize that Freed's fear and suffering may have been increased because he was aware of the accident and his injuries but had no ability whatsoever to attempt to protect himself, communicate, or advocate on his own behalf during those four hours. Thus, while Waste Management argues that this inability to communicate should have resulted in a lower award, it is reasonable to conclude that Freed's limitations may have only increased his fear. If the jury so concluded, it had the right to award damages for the suffering caused by that fear. Further, Waste Management's comparison fails to consider how much more fearful Freed would have been of being in an accident after already having been rendered a quadriplegic in a

previous motor vehicle accident. Because Waste Management has failed to adequately communicate how its "analogous" cases take into account the factual differences in the injuries and the victims, we find no error.

Finally, our conclusion that the award in this case is not excessive precludes Waste Management's due process argument. Accordingly, the trial court did not abuse its discretion by denying Waste Management's motion for remittitur.[11]

### F. EXPERT TESTIMONY

Waste Management argues that prejudice resulted because the accident reconstructionists improperly testified in such a way so as to fix fault or identify who was negligent. We disagree.

Waste Management relies primarily on *O'Dowd v Linehan*, 385 Mich 491; 189 NW2d 333 (1971). We first note that *O'Dowd* was decided before the adoption of MRE 704, which states that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Moreover, *O'Dowd* was one of the early cases dealing with accident reconstruction testimony and, as shown by the concurrence by Justice WILLIAMS, there was concern about the reliability and method of the expert in that case. The crucial issue in *O'Dowd* was which of two cars was in the wrong lane when the collision occurred, *id.* at 510, and the expert's attempt to describe the positions of the cars and his determination which driver had been in the wrong lane was what the Court viewed to be an attempt

---

[11] We note that although the dissent takes issue with the verdict form, see n 9 of this opinion, the dissent does not conclude that the trial court abused its discretion by declining to reduce the total amount of past noneconomic damages awarded.

to "fix the blame" for the accident. *Id.* at 513. Such testimony as to accident causation has become routine since the adoption of MRE 704 and we do not believe that *O'Dowd* should be read to bar an accident reconstructionist from testifying about what and whose actions caused the accident.[12] See *Ruddock v Lodise*, 413 Mich 499; 320 NW2d 663 (1982) (expert testimony that the trial court improperly concluded, relying on *O'Dowd*, should have been excluded because it embraced the ultimate issue to be decided by the jury was permissible under MRE 704 where the testimony could aid the jury in determining whether the defendant failed to maintain the road in a reasonably safe condition); see also *Portelli v I R Constr Products Co, Inc*, 218 Mich App 591, 602; 554 NW2d 591 (1996) ("Plaintiff's expert found fault . . . ."). Accordingly, the trial court did not abuse its discretion by permitting the accident reconstructionists to opine as to fault.

The same is true as to opinion testimony regarding ordinary negligence in light of MRE 704. Waste Management relies on *Koenig v South Haven*, 221 Mich App 711; 562 NW2d 509 (1997), rev'd on other grounds 460 Mich 667 (1999). However, that non-vehicle case involved an expert testifying that he believed a defendant's actions constituted gross negligence, not ordinary negligence. In the instant case, the only reference by any expert regarding negligence came in a single statement by Healthlink's expert, who testified that traveling at an excessive speed is negligent and that Whitty was driving negligently because he was speeding. Plaintiff's expert testified that a reasonably pru-

---

[12] Indeed, the Court in *O'Dowd* noted that "there was nothing so exceptional in the record *of this case* as to require an expert opinion on the ultimate issue for the jury." *Id.* at 513 (emphasis added). The limiting language implies that in other cases, such testimony may very well be appropriate.

dent driver would not drive a garbage truck 51 miles per hour in a 35 miles per hour zone. We do not believe that these statements fall outside the scope of MRE 704 and, even if they did, we would find no prejudice. The statement that speeding is unreasonable or negligent is so undeniably true that the jury did not need the expert's testimony to reach that conclusion; it would have reached the same conclusion anyway. This is distinct from the testimony in *Koenig* that dealt with a much more complex question dealing with the statutory definition of gross negligence. See *Rouch v Enquirer & News of Battle Creek*, 184 Mich App 19; 457 NW2d 74 (1990), vacated and remanded on other grounds 440 Mich 238 (1992) (holding that an expert witness's testimony that the defendant was negligent was properly admitted because the expert did not purport to define the term negligence and gave the testimony "in the form of an opinion after having first given a factual foundation for the ultimate issue to be decided"). We conclude that the fault testimony was permissible and, to the degree there was any error in the admission of these two statements, it cannot be said to have tainted the entire trial.[13]

---

[13] The dissent's concern regarding this issue is misplaced for several reasons. First, the dissent writes as if MRE 704 had never been adopted. That rule provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

Second, the dissent's discussion of the caselaw is highly attenuated. The dissent cites *Franzel v Kerr Mfg Co*, 234 Mich App 600, 621; 600 NW2d 66 (1999); *Carson Fisher, Potts & Hyman v Hyman*, 220 Mich App 116, 122; 559 NW2d 54 (1996); *People v Drossart*, 99 Mich App 66, 79-80; 297 NW2d 863 (1980); and *Koenig, supra* at 726. *None* of these cases involved testimony by an accident reconstructionist. The first involved testimony by a psychologist to the effect that the plaintiff was a credible witness, which is plainly not an issue for which expert testimony may be offered whether it goes to the ultimate question or not. *Franzel, supra* at

### G. JUDICIAL NOTICE

In its final claim on appeal, Waste Management argues that the trial court erred because it failed to take judicial notice of the speed limit in the area of the accident. We disagree.

622. The second involved a trial court's improper appointment of a special master in a bench trial to make findings of facts and law and prepare a judgment for the court in violation of the Michigan Constitution. *Hyman, supra* at 124. The third was a criminal case in which this Court rejected the limitations for which the dissent cites it and found that expert testimony on the ultimate issue of the defendant's sanity was proper because the question involved "a special field of activity" and that "[t]he objection that such testimony is an improper legal conclusion, invading the provinces of the judge and jury is without merit." *Drossart, supra* at 80, 82. The Court, *id.* at 81, quoted *Williams v State*, 265 Ind 190, 199; 352 NW2d 733 (1976), for the principle that an expert witness "does not state a *fact* but gives an *opinion* in order to aid the jury or trier of fact" (emphasis in original) and "[t]he argument that such an opinion usurps the function of the jury is simply not valid . . . for the simple reason that the jury is free to reject the opinion and accept some other view" (quotation marks and citations omitted). In the final case cited by the dissent, the Court found that under MRE 704, "counsel can ask the expert who caused the accident, or who ran the red light, without fear of objection." *Koenig, supra* at 726 (quotation marks and citation omitted).

Third, the dissent offers quotations from the testimony regarding causation of the accident and asserts that they constituted reversible error despite the fact that the defense did not object to the questions or answers quoted. There was also no objection to the quoted question regarding loss of the right of way. The dissent even cites as error the admission of a question and answer to which there was an objection, despite the fact that the trial court sustained the objection and excluded the testimony. In reality, the only two questions to which there was an overruled objection was one asking whether a driver has a duty to watch for other traffic and one asking if it was negligent to exceed the speed limit. Neither of these questions violated MRE 704. Moreover, given that the defense did not dispute that drivers should watch out for other traffic, the question did not even address an issue in dispute. The same is true of the question whether speeding is negligent. The defense never asserted that the garbage truck driver could have been speeding and still not been negligent; it argued only that he was not speeding. The questions may have been superfluous, but allowing them was not remotely reversible error.

Pursuant to MRE 201(b), for a trial court to take judicial notice of a fact, it "must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Taking judicial notice is discretionary. MRE 201(c). Thus, we review the trial court's refusal to take judicial notice for an abuse of discretion.

The parties agree that the relevant traffic control order indicates that the speed limit for the area where the accident occurred is 45 miles an hour. However, on its face, the traffic control order indicates that "[t]his order becomes effective when signs giving notice of same have been erected." This means that until 45 miles an hour signs were posted, the speed limit was not 45 miles an hour. All of the evidence indicated that the last sign before the area of the accident read 35 miles an hour. Given that the signage and the traffic control order did not agree as to the speed limit for the area, the fact could not reasonably be said to have been undisputed or capable of accurate and ready determination. Accordingly, the trial court did not abuse its discretion by refusing to take judicial notice of the speed limit.

Affirmed.

FITZGERALD, P.J., concurred.

TALBOT, J. (*concurring in part and dissenting in part*). I concur, in result only, with the majority opinion regarding the determinations that (a) dismissal of Waste Management's driver from the litigation does not preclude a finding of Waste Management's liability under the owner's liability statute, MCL 257.401, (b) the high/low agreement does not comprise a "*Mary*

*Carter*"[1] agreement, (c) the trial court's wording of the jury instructions pursuant to M Civ JI 12.01 was not erroneous, and (d) the trial court correctly refused to take judicial notice of the speed limit at the situs of the accident. However, I find it necessary to dissent on the remaining issues because of procedural concerns regarding the conduct of the trial.

## I. FACTUAL SUMMARY

This appeal involves a motor vehicle accident that occurred on November 2, 2004, involving a garbage truck owned by defendant Waste Management of Michigan, Inc., and an ambulance owned by defendant Healthlink Medical Transportation Services, Inc., which resulted in the death of the ambulance passenger, Bretton Freed. Significantly, long before this accident occurred, Freed was rendered a spastic quadriplegic as the result of a previous motor vehicle accident that occurred in 1987. In the early stages of trial, the driver of the Waste Management truck, William Whitty, was dismissed with prejudice. The order of dismissal for Whitty acknowledged that he was an employee of Waste Management and, at the time of the accident, was operating the garbage truck within the course and scope of his employment. Plaintiff argued that Healthlink was liable because of the failure of their driver to obey a stop sign and that Waste Management was negligent because of their driver's exceeding the posted speed limit.

At the conclusion of the jury trial in this case, plaintiff received an award of $14 million. The jury apportioned fault as being 45 percent attributable to

---

[1] *Booth v Mary Carter Paint Co*, 202 So 2d 8 (Fla App, 1967); but see *Dosdourian v Carsten*, 624 So 2d 241, 246 (Fla, 1993) ((outlawing) the use of *Mary Carter* agreements).

Waste Management and 55 percent attributable to Healthlink. Healthlink acknowledged negligence resulting from the driver of the ambulance, Kimberly Salas, having run a stop sign.[2] Healthlink also entered into a high/low agreement with plaintiff, limiting its financial liability to no less than $900,000 and no more than $1 million.[3]

## II. ANALYSIS—NEGLIGENCE/LIABILITY

In my opinion, this case should be reversed and remanded for a new trial because of errors that occurred and affected both the determination of negligence and the damages award for conscious pain and suffering. Specifically, with regard to the issue of Waste Management's negligence and liability, the trial court improperly permitted the accident reconstruction experts to opine on the ultimate issues of Waste Management's negligence and proportion of fault and failed to permit an instruction on the sudden emergency doctrine.

### A. ACCIDENT RECONSTRUCTION EXPERTS

Three accident reconstruction experts were called to testify: Richard Toner, Weldon Greiger, and Ronald Robins.[4] The majority of the testimony elicited from these individuals focused on their method and means of determining the speed of the garbage truck at the time of impact. All three experts opined that the garbage truck was traveling in excess of the posted 35 miles an

[2] Salas pleaded guilty of negligent homicide and was the only driver cited by the police at the accident scene.

[3] The high/low agreement coincided with Healthlink's insurance coverage.

[4] Plaintiff named Richard Toner and Ronald Robins as expert witnesses. Defendant Healthlink originally named Weldon Greiger as an expert witness.

hour speed limit.[5] The problem arises with the trial
court's latitude in the questioning of these witnesses,
over Waste Management's repeated objections, to opine
that Waste Management's driver was negligent and to
suggest an apportionment of fault.

Several examples of the improper testimony demon-
strate the extent and repetition of this error. When
Toner was testifying, he was asked:

> *Q.* Do you have an opinion as to whether a reasonably
> prudent or careful truck driver under the very same
> circumstances of this accident would be going down that
> road at 51–at minimum 51 miles an hour?
>
> *  *  *
>
> *A.* I don't think that was proper for him to do at all. I
> think that was unreasonable.

Toner was also asked:

> *Q.* Now, when a road — when a person is going north-
> bound like the truck driver, like Mr. Whitty. And there is
> traffic in front of him, can you tell the Jury if you have an
> opinion as to whether he has a duty to, "Keep a property [sic]
> look out"?
>
> *A.* Absolutely, every driver does.
>
> *  *  *
>
> *Q.* Why didn't he stop in time?
>
> *A.* He was going too fast.
>
> *Q.* In this case, Mr. Toner, do you have an opinion as to
> how many causes of this accident there were?
>
> *A.* Yes.
>
> *Q.* What are they?

---

[5] Greiger estimated Whitty's speed to be 55 miles an hour; Toner
estimated Whitty's speed at 51 miles an hour; Robins estimated Whitty's
speed to be in the range of 55 miles an hour.

*A.* Two.

*Q.* Specifically who and what?

*A.* Ms. Salas ran the stop sign and the refuge [sic] truck was going too fast. The combination of both of them caused the accident.

Relevant testimony by Greiger included the following:

*Q.* So in . . . in conclusion, was the speed of the garbage truck, any less or more important that then [sic] factor of the ambulance going through the stop sign?

*A.* Well, percentage of fault really is the purview of the Jury but if I was asked — if I'm asked the question, they really have to share equal responsibility.

\* \* \*

*Q.* You mentioned, Mr. Greiger, that as part of — plain and simple, Mr. Whitty was speeding, wasn't he?

*A.* Yes.

*Q.* And you believe he was negligently [sic] when he was speeding, exceeding the speed limit?

*A.* Yes.

*Q.* Don't you?

*A.* Yes.

\* \* \*

*Q.* Mr. Geiger [sic], in addition to the fact that Mr. Whitty in [sic] Waste Management was speeding, you told the Jury, as a result of that speeding, he lost the right of way, didn't you?

*A.* That's the law.

\* \* \*

*Q.* [T]o what you believe, as you told this Jury about both the ambulance, Ms. Salas and Mr. Whitty and Waste Management being causes of the accident, tell the Jury if you would, please, why you think they're both at fault?

*A.* Well, obviously you need to yield with the stop sign. Had — had the ambulance stopped at the stop sign, there wouldn't have been an accident. Had Mr. Whitty not been speeding, there would not [sic] been an accident.

It is recognized that an expert's opinion regarding the law is of no aid to the jury and could result in confusion. *Franzel v Kerr Mfg Co*, 234 Mich App 600, 621-622; 600 NW2d 66 (1999). The function of an expert witness is to supply expert testimony, which includes opinion evidence, subject to the development of a proper foundation. Opinion evidence may embrace ultimate issues of fact, such as, in this instance, the speed of the garbage truck before impact. "However, the opinion of an expert may not extend to the creation of new legal definitions and standards and to legal conclusions." *Carson Fischer Potts & Hyman v Hyman*, 220 Mich App 116, 122; 559 NW2d 54 (1996). In addition, "an expert witness is not permitted to tell the jury how to decide the case." *Id.* at 122-123. "A 'witness is prohibited from opining on the issue of a party's negligence or nonnegligence, capacity or noncapacity to execute a will or deed, simple versus gross negligence, the criminal responsibility of an accused, or [the accused's] guilt or innocence'." *Id.* at 123, quoting *People v Drossart*, 99 Mich App 66, 79-80; 297 NW2d 863 (1980). Consequently,

> it is error to permit a witness to give the witness' own opinion or interpretation of the facts because doing so would invade the province of the jury. An expert witness also may not give testimony regarding a question of law, because it is the exclusive responsibility of the trial court to find and interpret the law. [*Carson, supra* at 123 (citations omitted).]

In other words,

> where a jury is as capable as anyone else of reaching a conclusion on certain facts, it is error to permit a witness to give his own opinion or interpretation of the facts because

it invades the province of the jury. [*Koenig v South Haven*, 221 Mich App 711, 726; 562 NW2d 509 (1997), rev'd on other grounds 460 Mich 667 (1999), quoting *Drossart*, *supra* at 80.]

By permitting the experts to opine definitively regarding Waste Management's negligence and the apportionment of fault, the trial court effectively removed from the jury the decision on the ultimate issue of negligence. The scope of expert testimony should have been restricted to whether Waste Management's driver was speeding. Further compounding the error regarding the admissibility of this testimony is the omission on the verdict form of a provision for the jury to indicate whether Waste Management's driver violated a specific statute or common-law standard of care.[6] The jury's indication that Waste Management was negligent seems a mere formality given the trial court's treatment of the truck driver's negligence as a foregone conclusion rather than a question of fact to be determined by the jury. I acknowledge that the majority of testimony, which could be deemed persuasive, indicated Waste Management's driver was exceeding the applicable speed limit. However, because Waste Management's driver and his passenger estimated that he was driving between 35 miles an hour and 40 miles an hour,[7] whether the driver was speeding and violated a statutory regulation or a common-law standard of care comprised a factual issue that was solely within the purview of the jury.

---

[6] I acknowledge that this discrepancy is rendered irrelevant given Waste Management's failure to object to this aspect or portion of the verdict form. *Chastain v Gen Motors Corp (On Remand)*, 254 Mich App 576, 591-592; 657 NW2d 804 (2002). See, also, *Hilgendorf v St John Hosp & Med Ctr Corp*, 245 Mich App 670, 696; 630 NW2d 356 (2001); *Phinney v Perlmutter*, 222 Mich App 513, 537; 564 NW2d 532 (1997).

[7] Whitty testified that he had slowed down and was proceeding at a speed less than 35 miles an hour when he approached the intersection.

Clearly, credibility and factual issues existed regarding the garbage truck's speed at the time of the accident. I do not question that sufficient evidence was presented, through expert testimony, to support a determination that Waste Management's driver was speeding at the time of the accident. However, by permitting the experts to opine that Waste Management's driver was negligent and to suggest an apportionment of fault, the trial court effectively removed the determination of negligence from the jury and it is impossible to ascertain the impact of these opinions on the ultimate verdict.

### B. SUDDEN EMERGENCY DOCTRINE

Another issue of concern pertaining to the determination of Waste Management's negligence or liability is the trial court's failure to give the requested jury instruction on the sudden emergency doctrine. The trial court reasoned that Waste Management was not entitled to the instruction because it, at least in part, created the hazard. I believe the majority misconstrues Waste Management's argument on this issue.

The majority suggests that Waste Management contends that the instruction is required to be given to the jury in conjunction with the instruction on proximate cause. However, Waste Management asserts that the trial court's refusal to give the instruction was error because it served as a predetermination that its driver was speeding. I agree with Waste Management that the failure to give the instruction effectively resulted in the trial court ruling on Waste Management's negligence rather than the jury making a determination on this issue.

The majority contends the trial court did not abuse its discretion by refusing to give the instruction because the sudden emergency doctrine only excuses a statutory violation "in regards to the events that occur after the

defendant discovers the emergency," and in this instance, it was the speed of Waste Management's garbage truck before the emergent condition of the ambulance running the stop sign that precluded the ability to stop or avoid the accident. However, like the trial court, this presupposes that the garbage truck driver was speeding, which should have been a question of fact reserved solely for resolution by the jury. The jury should have first made a determination regarding whether Waste Management's driver was speeding and then, on the basis of that factual determination, should have decided whether the sudden emergency doctrine was applicable. While, in all likelihood, the jury would determine that the doctrine was not applicable, it was improper for the trial court to preclude giving the instruction on the basis of the court's assumption that Waste Management's driver was speeding, further usurping the role of the jury.

### III. ANALYSIS—DAMAGES

While the errors pertaining to liability and negligence are sufficient, standing alone, to require a new trial, I also believe that error occurred involving the propriety of testimony by Dr. Werner Spitz regarding the decedent's fear of death or impending sense of doom. In addition, issues exist regarding the format or construction of a portion of the jury verdict form, which calls into question the award for conscious pain and suffering and the propriety of the trial court's ruling on remittitur, necessitating that the award be vacated.

### A. WERNER SPITZ

The testimony elicited from Spitz was comprised of two interrelated components involving the decedent's actual physical capacity to sense pain and the dece-

dent's experience of fear as a compensable aspect of suffering. "A jury may award reasonable compensation for the pain and suffering undergone by the decedent while conscious during the intervening time between the injury and death." *Byrne v Schneider's Iron & Metal, Inc*, 190 Mich App 176, 180; 475 NW2d 854 (1991). "The existence of a decedent's conscious pain and suffering may be inferred from other evidence that does not explicitly establish the fact." *Id.*

There was no actual dispute that the decedent was conscious for the approximately four hours following the time of the accident until he was transferred to University of Michigan Hospital, where he expired. Issues arise pertaining to Spitz and others indicating that the decedent was aware or cognizant, after the accident, and maintained some level of understanding of his condition and impending death. There was conflicting testimony regarding the decedent's ability to experience pain because of his preexisting medical condition and longstanding diagnosis as a spastic quadriplegic.

Waste Management raised concerns regarding the testimony anticipated to be elicited from Spitz, based on his deposition testimony, regarding the decedent's experience of a "fear of death," initially seeking the testimony to be excluded or, in the alternative, that a *Daubert*[8] hearing be conducted. The trial court denied the request for a *Daubert* hearing and, instead, defendants' concerns were addressed before Spitz testified at trial, outside the presence of the jury. At this hearing, the trial court determined that it would permit Spitz to opine on the decedent's fear of death, but that it would limit such testimony to the possibility that he "could have feared impending doom."

---

[8] *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

The initial error by the trial court involves the overall breadth and scope of the testimony it permitted from Dr. Spitz. This witness was listed as an expert in forensic pathology and, initially, it appears he was to testify that the decedent died as a result of the injuries incurred in this accident. However, at some point, Dr. Spitz's role was inexplicably expanded and he was permitted, as a forensic pathologist, to testify regarding the decedent's ability to feel or experience pain following the accident. While I would contend it was improper to permit a forensic pathologist to provide "expert" testimony so far afield from his actual area of expertise, unfathomably the trial court went even further and allowed the scope of his testimony to be further expanded, permitting Spitz to render an opinion on the decedent's fear of impending doom as, asserted by plaintiff's counsel, "part and parcel of conscious pain and suffering."

I believe that the rulings by the trial court, which allowed Spitz to testify beyond his identified area of expertise, constituted serious error on a multitude of levels. Foremost, I cannot comprehend how Spitz was permitted to testify or opine as an expert on matters pertaining to the decedent's conscious pain and suffering when Spitz was only qualified or identified as an expert in forensic pathology. Further, the basis for the testimony elicited from Spitz was purely speculative and should have been excluded in accordance with MRE 403. *Phillips v Deihm*, 213 Mich App 389, 402; 541 NW2d 566 (1995). To a limited extent, the opinion expressed by Spitz regarding decedent's fear was based on testimony by a physician's assistant, Kelly Long,[9] who had been involved for an ongoing time period in the decedent's care at the rehabilitation center where he

---

[9] Also referred to as Kelly Long Barker.

lived. Upon hearing of the accident, Long went to the accident scene and remained with the decedent through his transfer to University of Michigan Hospital. Long asserted, on the basis of her familiarity with the decedent, that his facial expressions indicated that he was traumatized and fearful following the accident. As has been repeatedly recognized, "[t]he facts and data on which an expert relies in formulating an opinion must be reliable." *Anton v State Farm Mut Automobile Ins Co*, 238 Mich App 673, 677; 607 NW2d 123 (1999). In this instance, the opinions expressed by Spitz were not based on reliable facts and data, but were merely premised on another individual's perception and opinion. As such, for the trial court to permit Spitz to testify regarding the decedent's fear of death and impending doom was impermissibly speculative and without adequate basis.

Compounding these errors was the failure of the trial court to require the questions directed to Spitz, and his resultant responses, to conform to the purported limitations placed on his testimony. Despite numerous and ongoing objections by Waste Management's counsel, the trial court permitted Spitz to testify that he believed the decedent experienced pain, suffering, and a fear of death or an impending sense of doom. The trial court indicated it would limit testimony by Spitz to whether decedent "could have feared impending doom." I agree with Waste Management's argument on appeal that the trial court repeatedly permitted Spitz to exceed this purported limitation. Examples of improper testimony by Spitz include, but are not necessarily limited to, the following:

> I think there's clear evidence that he was observed in a condition that was different from the usual condition that he was in. And that was based on the fact that he was in a state of great fear.

* * *

The fear of impending doom is an instinct.

\* \* \*

All—any and all the injuries that he sustained were associated with pain and on top of that, the incident as a whole, even without manifestations of—direct manifestations of trauma by way of abrasion, laceration, fracture or whatever. The incident as a whole caused fear of dying in this individual.

\* \* \*

He could see. He could hear. And this whole event was associated, as may be expected with a lot of commotion. And a lot of physical changes in an individual who is very susceptible . . . . So that is what caused the fear of impending doom.

\* \* \*

We know he is losing blood and we know he is fearful.

\* \* \*

He's losing blood rapidly. He is not having enough oxygen to breath [sic] and he's probably fearful as well.

\* \* \*

That would cause him pain. It would cause him—he—can see. He can—he can observe the fact that there is blood shed. That makes him fearful, too. Or that could make him fearful too.

\* \* \*.

[I]n association with the physical pain he could have had a fear of dying, the fear of impending doom.

Ultimately, the determination of the existence and extent of the decedent's pain and suffering for this four-hour period following the accident was a determination

for the jury because conflicting testimony existed regarding the decedent's ability to perceive or experience pain and his level of cognizance. The decedent's physician reported that, historically, the decedent evidenced some movement and sensation in response to pinprick tests in his lower extremities. Waste Management presented testimony by a physician regarding the improbability of sensation, or the experience of pain, based on the decedent's preexisting diagnosis and evidence that the decedent was not administered any pain medication either at the accident site or when later hospitalized. While issues of fact and credibility determinations existed for the jury regarding the decedent's ability to experience pain, the trial court erred in permitting Spitz to repeatedly exceed the purported limits imposed on his testimony by indicating that the decedent's fear of dying or sense of impending doom was an established fact rather than a mere possibility. Because it is impossible to discern the impact or influence on the jury of such improper and repetitive references in its contemplation of damages, I would vacate the award for pain and suffering and remand this issue to the trial court for a new trial.

### B. REMITTITUR

I believe the trial court also erred in its determination that sufficient evidence existed to support the damage award for conscious pain and suffering in its denial of Waste Management's request for remittitur. Waste Management sought remittitur or judgment notwithstanding the verdict (JNOV) on two separate occasions (October 12, 2007, and December 7, 2007) premised primarily on the insufficiency of the evidence to sustain such a verdict and comparisons to significantly lower verdicts awarded in other cases, which were factually similar to the circumstances pertaining to this decedent. At the hearing on the first motion, the trial court ruled:

> [T]he issue before me in this series of motions is whether the jury had sufficient evidence to decide the question of conscious pain and suffering. And I find that they did. They did have sufficient evidence and so the motion for JNOV, for a new trial and for remittitur based on the plaintiff's inability, Brett Freed's inability to have conscious pain and suffering is denied.

Following argument on the second motion, the trial court ruled, in relevant part:

> On the issue of remittitur, I find that the lawyers had ample time [sic] craft and approve the form of the verdict. I find further that there was sufficient evidence to support loss of society and companionship. I find lastly there was sufficient evidence to support conscious pain and suffering. Therefore, the motion for remittitur is denied.

Contrary to the trial court's implication that Waste Management waived this issue, Waste Management did object to the combination of an award of damages for pain and suffering and loss of society on the jury verdict form. Following the motion for remittitur, the trial court merely indicated that there was sufficient evidence to support the award.

This Court is required to accord due deference to a trial court's decision on remittutur and should only disturb the ruling if an abuse of discretion is shown. *Palenkas v Beaumont Hosp*, 432 Mich 527, 533-534; 443 NW2d 354 (1989). MCR 2.611(E)(1) provides:

> If the court finds that the only error in the trial is the inadequacy or excessiveness of the verdict, it may deny a motion for new trial on condition that within 14 days the nonmoving party consent in writing to the entry of judgment in an amount found by the court to be the lowest (if the verdict was inadequate) or highest (if the verdict was excessive) amount the evidence will support.

Our Supreme Court has identified a number of factors to be considered in evaluating a damages award, stating:

> [T]rial courts, in addition to evaluating whether a jury award is supported by the proofs, have conducted a myriad of other inquiries in determining whether remittitur would be proper in a particular case: 1) whether the verdict "shocks the judicial conscience"; 2) whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; 3) whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; 4) whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions. [*Palenkas, supra* at 532.]

The *Palenkas* Court determined that the only "*expressly* authorized" consideration "is whether the jury award is supported by the evidence," *id.* (emphasis in original), citing MCR 2.611(E)(1), and expressly rejected the " 'shock the conscience' " inquiry as an "inappropriate consideration" because of its subjectivity, *id.* Instead, the Court indicated that inquiries pertaining to remittitur should focus and "be limited to *objective* considerations relating to the actual conduct of the trial or to the evidence adduced." *Id.* (emphasis in original).

Contrary to the trial court's ruling, because it is impossible to ascertain precisely how much of the award was attributable to pain and suffering versus the loss of society and companionship as a result of the consolidation of these items on the jury verdict form, the propriety or reasonableness of the award cannot be determined. In this instance, the jury awarded $9 million in total damages for conscious pain and suffering and the loss of society and companionship from the date of the accident through to the date of trial (specifi-

cally for the period of November 2, 2004, through May 9, 2007).[10] Of this amount, $4 million of the damages awarded were designated for the date of the accident and Freed's death on November 2, 2004, through the end of the 2004 calendar year. Specifically, the relevant portion of the jury verdict form, which was objected to by Waste Management, provides the following:

**Question No. 6:** What is the total amount of the Plaintiff's damages to the present date for conscious pain and suffering, and loss of society and companionship?

Answer:          $9,000,000.00

11/2/04 – 12/34/04    $4,000,000.00

2005          $2,000,000.00

2006          $2,000,000.00

1/31/07 – 5/9/07    $1,000,000.00

The verdict form listed as one item, without separation or distinction, damages for both conscious pain and suffering and the loss of society and companionship across four different time periods (November 2, 2004, through December 31, 2004; 2005; 2006; January 31, 2007, through May 9, 2007).[11] Clearly, as a matter of logic, conscious pain and suffering damages can only be awarded for the four-hour time period between the accident and the decedent's demise. However, because of the manner in which this question is constructed on the verdict form, it is impossible to ascertain what amounts or apportionment, if any, were made for con-

---

[10] An additional $5 million was awarded for future damages pertaining to loss of society and companionship (from May 10, 2007, through November 2, 2011).

[11] I would note that the time period designated in 2007 in this category inexplicably begins at January 31, 2007, rather than January 1, 2007.

scious pain and suffering versus loss of society and companionship while the decedent was alive during this four-hour period. Construction of the verdict form and the failure to delineate between the actual date of the accident from subsequent time frames, as well as between conscious pain and suffering and loss of society and companionship, necessarily raises additional questions regarding whether the jury may have incorrectly awarded pain and suffering damages for time periods after the decedent's demise. As a result, I find it impossible to uphold the trial court's determination regarding the sufficiency of the evidence to support this portion of the damages award because it cannot be ascertained with any certainty or precision what amount comprised the actual award for conscious pain and suffering. In part, for this same reason, I question the award for loss of society and companionship, but as a result of the failure of counsel to adequately develop a record sufficient for appeal, I am unable to address the remainder of the damages award.

IV. CONCLUSION

Because of the obvious errors in the conduct of the trial in this matter, and with particular emphasis on the impropriety of the expert testimony elicited, I would reverse the judgment and remand for a new trial regarding Waste Management's liability and damages.