*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DAMERIOUS ROBERT CHURCH,

        Defendant-Appellant.

UNPUBLISHED
April 27, 2023

No. 359316
Ingham Circuit Court
LC No. 19-000457-FC

Before: GADOLA, P.J., and GARRETT and FEENEY, JJ.

PER CURIAM.

Defendant, Damerious Robert Church, appeals as of right his jury convictions of two counts of second-degree murder, MCL 750.317, and two counts of operating a motor vehicle while intoxicated and causing death, MCL 257.625(4). The trial court sentenced him to concurrent terms of 324 to 600 months' imprisonment for the second-degree murder convictions and 72 to 180 months' imprisonment for the operating while intoxicated convictions. We affirm.

## I. FACTS

On March 8, 2019, nine-year-old De'Andre Moore and eight-year-old De'Asia Church were killed in an automobile crash while riding in a car driven by defendant, the father of De'Asia. The prosecutor presented evidence from several witnesses that immediately before the crash defendant was driving on I-96 in an extremely dangerous manner. A blood test administered after the crash indicated that defendant's blood contained .112 grams of alcohol per 100 milliliters of blood, above the legal limit of .08 grams. At trial, the prosecution introduced an audio recording from a telephone call defendant made from jail in which defendant admitted to drinking alcohol while driving that evening. Defendant testified at trial and denied any improper driving. He also initially denied drinking any alcohol that day, but later stated that he had consumed one alcoholic beverage. The jury convicted defendant of two counts of second-degree murder and two counts of operating a motor vehicle while intoxicated and causing death. Defendant now appeals.

## II. DISCUSSION

### A. *MENS REA*

Defendant contends that the prosecutor presented insufficient evidence of the necessary *mens rea*, or criminal intent, for second-degree murder. We disagree.

We review de novo a defendant's challenge to the sufficiency of the evidence to determine whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find that the prosecution proved each element of the offense beyond a reasonable doubt. *People v Anderson*, 331 Mich App 552, 557; 953 NW2d 451 (2020). We draw all reasonable inferences in support of the verdict. *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018). The trier of fact may consider both direct and circumstantial evidence when determining whether the evidence presented is sufficient to support a conviction. See *id*. The trier of fact determines what inferences fairly may be drawn from the evidence and the weight to be accorded those inferences, *id*., and determines the credibility of witnesses. *People v Eisen*, 296 Mich App 326, 331; 820 NW2d 229 (2012).

To prove second-degree murder, the prosecution must demonstrate (1) a death, (2) caused by an act of the defendant, (3) that the defendant acted with malice, and that (4) the defendant acted without justification or excuse. *People v Gafken*, __ Mich ___, ___; ___NW2d ___ (2022) (Docket No. 161835); slip op at 5. Malice may be established by demonstrating that the defendant had the intent to kill, the intent to cause great bodily harm, or "the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm," also described as "the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result." *Id*. Malice thus may be proved by establishing that the defendant possessed "the intent to do an act that is in obvious disregard of life-endangering consequences." *People v Werner*, 254 Mich App 528, 531; 659 NW2d 688 (2002). Malice may be inferred when the evidence demonstrates that the defendant "intentionally set in motion a force likely to cause death or great bodily harm." *Id*. (quotation marks and citation omitted).

In this case, defendant contends that the prosecution did not establish that he acted with malice. A review of the record, however, demonstrates that the prosecution presented sufficient evidence that defendant acted with wanton and willful disregard of the likelihood that the natural tendency of his behavior was to cause death or great bodily harm. Multiple witnesses testified that immediately before the crash, defendant was operating his vehicle in an extremely dangerous manner. John Twining testified that on the night of the crash, he was traveling in the left lane on I-96 and passing a truck traveling in the right lane when he saw "lights coming at a tremendous speed" in his rearview mirror. Twining testified that the approaching car was traveling at "a very frightening speed" and "shockingly fast," and he told his passengers to brace themselves because he anticipated a crash. Twining had over 40 years of driving experience and also held a commercial driver's license. He estimated that the approaching car was traveling at a speed of at least 90 miles per hour (mph). Twining testified that the car swerved in front of his car and "threaded the needle" between Twining's car and the truck, passing Twining on the right and the truck on the left, clearing the vehicles by barely a car length. Twining exclaimed to his passengers

that the driver was either drunk or high and that the police needed to be called because the driver was going to kill someone. Shortly thereafter, Twining saw the car in the ditch.

Jonathan Rominski testified that he was driving a semitruck in the right lane on I-96 that night when "all of the sudden, a car passed me with such speed that the best way I can describe it is sometimes you have a sports car or a motorcycle zoom by you and almost causes you to have, like, an adrenaline rush." Rominski had his cruise control set at 68 mph and estimated that the car passed him traveling approximately 100 mph. Rominski then saw the car attempt to pass a group of cars using the left "soft shoulder," then shoot off the roadway to the right and crash into a tree in the ditch.

Jodi Hoag also was traveling on I-96 that night and testified that she saw a car "flying by" and recklessly weaving through traffic at a high rate of speed. She exclaimed to her husband that the car appeared to be traveling 100 mph and that "he better slow down or he's going to kill someone." She described defendant's driving as erratic, terrifying, and dangerous. She later saw the car in the ditch.

Theresa Hayes testified that she was traveling on I-96 that night and saw headlights approaching extremely fast from behind her vehicle. She was concerned about being rear-ended; when she moved into the right lane, the car "flew past" her, and the driver seemed "out of control." She saw the car go onto the left shoulder to pass another car, then fly across the road into a ditch on the right, stopping when it hit a tree.

Aubrey Bills testified that she and her boyfriend were traveling on I-96 that night and were in the left lane passing another vehicle when a car passed them on the left on the shoulder, then reentered the roadway, spun out of control, then went off the highway to the right and hit a tree. She estimated that the car was traveling over 90 mph when it passed her car on the left shoulder.

Deputy Richard Hoeksema was a first responder to the accident scene, and at trial was qualified as an expert in traffic crash reconstruction. He testified that he arrived at the crash scene shortly after the accident occurred. Defendant's car was approximately 150 feet to the right of the eastbound roadway of I-96, where it had crashed into a tree backwards. The rear of the car was severely damaged. The two children were deceased, and defendant was unconscious. At trial, he testified that the tire impressions and marks on the roadway were largely consistent with the witnesses' statements.

A blood test administered after the crash indicated that defendant's blood contained .112 grams of alcohol per 100 milliliters of blood. Defendant testified at trial and admitted that attempting to pass on the left shoulder would endanger people's lives and that it would create a high risk of death or great bodily harm to attempt to do so.

The evidence presented was sufficient to demonstrate the element of malice. Defendant's dangerous driving was similar to that found adequate in *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998) to support a conviction of second-degree murder. The *Goecke* Court stated:

> Testimony established that the defendant lived within one mile of the scene of the
> accident, had a blood-alcohol content of 0.18 percent, drove well in excess of the

speed limit, ran a red stoplight, drove through an intersection at a time when he could have seen at least three vehicles properly traveling through the intersection, narrowly missed hitting two cars before hitting the victims' car, and killed two people. A jury could reasonably infer that the defendant placed himself in a position the results of which a reasonable person would know had the natural tendency to cause death or great bodily harm. [*Goecke*, 457 Mich at 471-472.]

Here, defendant's driving was beyond reckless, as established by the extensive witness testimony. Coupled with the evidence of defendant's intoxication, the record supports the jury's conclusion that he acted with a wanton and willful disregard of the likelihood that the natural tendency of his actions would be to cause death or great bodily harm. See *id.*

## B. DEPUTY HOEKSEMA'S OPINION TESTIMONY

Defendant contends that the prosecutor improperly elicited from Deputy Hoeksema opinion testimony that defendant caused the accident and that defendant's behavior met the elements of second-degree murder, thereby improperly invading the province of the jury. Defendant failed to preserve this challenge by objecting at trial. See *People v Isrow*, 339 Mich App 522, 529; 984 NW2d 528 (2021). We review unpreserved issues for plain error affecting substantial rights. *Id.* To avoid forfeiture under the plain error rule, (1) the error must have occurred, (2) the error must be plain, i.e., clear or obvious, (3) and the plain error must have affected the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). An error is clear or obvious if it is not "subject to reasonable dispute." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018). Whether a plain error affected a defendant's substantial rights requires a showing of "prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* at 763-764 (citation, quotation marks, and brackets omitted).

MRE 702 permits the admission of expert testimony. A trial court may admit the testimony of an expert if the trial court determines "that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Under that rule, "a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." MRE 702.

If an expert's opinion is otherwise admissible, it is not rendered inadmissible when it "embraces an ultimate issue to be decided by the trier of fact. MRE 704; *People v McFarlane*, 325 Mich App 507, 519; 926 NW2d 339 (2018). However, an expert witness is not permitted to testify about the requirements of law that apply to the particular facts of the case nor to phrase his or her opinion in terms of a legal conclusion. *Id.*, citing *People v Drossart*, 99 Mich App 66, 79; 297 NW2d 863 (1980). An expert witness may not offer an opinion about whether the defendant is guilty or innocent, *People v Fomby*, 300 Mich App 46, 53; 831 NW2d 887 (2013), and may not tell the jury how to decide the case. *Drossart*, 99 Mich App at 79.

At trial in this case, the prosecutor asked Deputy Hoeksema:

Sir, based on your investigation not only at the scene in the photographs that were taken but also witness statements and evidence you have collected in this matter, do you have an expert opinion as to who was at fault for causing the crash that resulted in De'Andre and De'Asia's deaths?

Deputy Hoeksema replied:

The opinion was that [defendant] was driving in a reckless and dangerous manner, something that he hopefully should have known that this could cause serious injury or death. He was operating while intoxicated. He was passing people on the shoulder . . . . he caused that crash, and he caused the death of those children. No one else did it.

Testifying as an expert in traffic-crash reconstruction, Deputy Hoeksema stated that the scene was analyzed with a "total station," a laser tool that takes measurements. He testified about tire imprints and marks on the shoulder and roadway showing a path to the crash site. An accident reconstructionist can testify about who caused an accident. *Freed v Salas*, 286 Mich App 300, 338; 780 NW2d 844 (2009). Here, no plain error is apparent with regard to the deputy's causation testimony. He was testifying as an expert capable of offering opinion testimony on the cause of the accident, and such testimony was permissible under MRE 704 despite embracing an issue for the jury's ultimate determination.

Defendant also challenges the deputy's statement that "hopefully [defendant] should have known that this could cause serious injury or death," arguing that Deputy Hoeksema was stating a legal conclusion on the issue of malice. An expert witness is not to phrase his or her opinion in the form of a legal conclusion. *McFarlane*, 325 Mich App at 519. Although the deputy's reference in this case that "hopefully [defendant] should have known that this could cause serious injury or death," arguably invaded the province of the jury to determine defendant's *mens rea*, there is no basis for reversal under the standards of the plain-error doctrine. At trial, defendant conceded the element of intent during his testimony. Defendant denied driving off the road and trying to pass anyone on the shoulder, testifying that to do that would have endangered the lives of the children and of other people driving near him, and would have created a high risk of death or great bodily harm. Defendant thus conceded the point on which the deputy opined, i.e., that defendant knew that driving in the manner alleged would create a risk of serious injury or death. The jury was left to decide whether to believe the witnesses and physical evidence in support of the alleged driving pattern or whether to believe defendant's assertion that he did not drive recklessly that evening. As a result, no outcome-determinative error occurred. See *Carines*, 460 Mich at 763.

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that his trial attorney rendered ineffective assistance of counsel. Defendant failed to preserve this claim for review by moving for a new trial or evidentiary hearing before the trial court. See *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Our review of this issue therefore is limited to error apparent on the existing record. See *id*.

To prevail on a claim of ineffective assistance of counsel, defendant must demonstrate that (1) his counsel's performance fell below an objective standard of reasonableness, and that (2) but for his counsel's deficient performance, there is a reasonable probability that the outcome of the proceedings would have been different. *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012). Counsel's performance did not fall below an objective standard of reasonableness if this Court can conceive of a legitimate strategic reason for counsel's conduct. *People v Clark*, 330 Mich App 392, 427; 948 NW2d 604 (2019). A reasonable probability is one sufficient to undermine confidence in the outcome of the proceedings. *Randolph*, 502 Mich at 9. The defendant has the burden to establish the factual predicate of his claim of ineffective assistance of counsel, *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999), and defendant must overcome the "strong presumption" that his counsel's performance was part of a sound trial strategy. *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012).

Defendant argues that counsel was ineffective for failing to object to Deputy Hoeksema's opinion testimony. As discussed, Deputy Hoeksema's testimony about the cause of the collision was admissible; counsel was not required to advocate a meritless position or raise a futile objection. See *People v Savage*, 327 Mich App 604, 617; 935 NW2d 69 (2019). Regarding the deputy's testimony relating to the element of malice, as discussed, no outcome-determinative error is apparent on the record because defendant admitted during his testimony that it would have been extremely dangerous to the lives of the people around him if he had driven in the manner suggested by the evidence, which was the point the deputy ostensibly made with his testimony. Consequently, there is no reasonable probability of a different outcome if counsel had objected to the deputy's testimony.

## D. STANDARD 4 BRIEF[1]

### 1. INEFFECTIVE ASSISTANCE OF COUNSEL

In his Standard 4 supplemental brief, defendant argues that counsel also was ineffective for failing to introduce videos from the children's telephones that defendant contends would have shown that he was driving normally that night. During defendant's testimony at trial, defense counsel asked defendant how the accident occurred. Defendant did not directly answer the question but said that he had "submitted videos" from the children's telephones to his previous attorneys and to the prosecution. He said, "Now I'm not going to go through the videos because it doesn't make sense. You can't barely see them anyway." He testified that at one point De'Andre "was recording De'Asia when she was Facetiming" someone. Defendant testified that the video showed that the children were not traveling in a car being driven recklessly because the children were not being thrown about inside car and were not afraid.

Defendant's statement on the witness stand that he was not going to "go through the videos because it doesn't make sense. You can't barely see them anyway," undermines his assertion that counsel acted below an objective standard of reasonableness by failing to introduce the videos. In

---

[1] Defendant raises additional issues in his supplemental brief filed pursuant to Administrative Order 2004-6, Standard 4.

addition, videos showing that the children were not afraid and trusted defendant's driving would not show that safe driving was occurring. Finally, as noted by the prosecution, it would have been a risky strategy for counsel to show the jury videos of alive and vibrant children when this case involved their gruesome deaths that occurred shortly thereafter. We conclude that counsel was not ineffective for not introducing the videos.

Defendant also argues that defense counsel mischaracterized another video to the trial court. At trial, defense counsel informed the trial court that defendant wanted him to introduce a video that defendant's sister had received from Tiara Moore, the children's mother, that ostensibly showed that Moore still cared about defendant, did not want him to be prosecuted, and did not want him to be heavily penalized. The prosecutor responded that the video was irrelevant and also that Moore currently was not advocating leniency for defendant. The trial court did not admit the video. On appeal, defendant does not present a valid basis for admission of the video, and thereby has failed to demonstrate ineffective assistance on the part of his counsel.

Defendant also contends that counsel should have presented (1) an expert witness to testify that the driving pattern testified to by the various eyewitnesses was mathematically impossible; (2) various witnesses to testify about defendant's character; and (3) a witness to testify, in some unspecified manner, about what Moore stated on the witness stand. Defendant fails to establish the factual predicates for these claims; he does not identify potential expert testimony, does not state what the proposed character witnesses would have stated on the witness stand, and does not indicate what the proposed witness would have said about Moore. Because defendant fails to establish a factual predicate of his claim of ineffective assistance of counsel, appellate relief is not appropriate. See *Hoag*, 460 Mich at 6.

## 2. PROSECUTORIAL MISCONDUCT

Defendant contends that the prosecutor engaged in misconduct by maliciously presenting false evidence. We review this unpreserved issue for plain error. *Carines*, 460 Mich at 763-764.

A conviction obtained through the knowing use of perjured testimony violates the defendant's due process rights, and must be set aside if there is any reasonable likelihood that the false testimony affected the jury's verdict. *People v Bass*, 317 Mich App 241, 272; 893 NW2d 140 (2016). In this case, defendant contends that the witnesses' testimony describing his driving on the night of the collision was mathematically impossible, and therefore perjured. Defendant presents no support for his assertion. He relies primarily upon his car's event-data recorder (EDR) showing that the car was traveling at 80 mph when the EDR was activated as evidence that he was not traveling as fast as witnesses estimated.

Lieutenant Danial Munford, however, provided a plausible explanation for the speed recorded by the EDR, testifying that the EDR captured a "nondeployment event," and explained that "[a] nondeployment event is an event that occurs that is significant enough to wake that module up and let it know something is not right. . . ." Here, the car's EDR had 2.5 seconds of data; it showed an initial speed of 80 mph, and "[a] half a second later you see the speed being reduced to 55 miles per hour." The lieutenant explained that this reduction was "physically impossible to obtain by braking" and must have resulted from the vehicle skidding to the right across the roadway. The Lieutenant explained that at 1.5 seconds the vehicle was traveling zero

mph. The officer explained that the vehicle could have been proceeding faster than 80 mph before the EDR initiated and he reiterated that something occurred to make the EDR wake up at that moment, possibly at the point when defendant's car reentered the pavement after being on the soft shoulder. Given the lieutenant's testimony, there is no support for defendant's assertion that the scientific evidence conflicts with the witnesses' testimony.

Defendant also contends that the prosecutor improperly admitted the recording of a telephone call made by defendant from jail, arguing that it is not his voice on the call. In the call, defendant spoke of "popp[ing] a bottle" in the car and doing "shots" on the day in question. The recording was properly authenticated as containing defendant's voice before its admission. Defendant, during his testimony, implied that the voice was changed with a "mixer app" to sound like him. There is no indication, aside from defendant's unsupported assertion, that the voice on the recording was falsified. In addition, counsel conceded the admission of the recording, thereby waiving objection and extinguishing claimed error. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000).

Defendant also challenges Deputy Hoeksema's testimony that there was no indication that defendant's car was struck by another vehicle before crashing into a tree. Defendant claimed at trial that his car was struck by another vehicle and that this collision caused the crash. When asked if defendant's car was examined for paint from other cars or objects, Deputy Hoeksema testified:

The follow-up photos that I took at the tow yard, I did not see anything. Obviously, as you saw from the photos, there was extreme intrusion, extreme damage to the rear of the car that would prevent me from saying that there was paint on the back of the car.

There was paint on the back of the car, but that was from other items that hit it or that it hit. The front of the car had no indication that he struck anyone either.

On redirect, the deputy stated that, in August 2019, he had taken photographs of the vehicle to investigate a claim by defendant that it might have been struck by an object or another car. Deputy Hoeksema said that he saw no evidence of the Impala "being rear-ended, hit by the side, nothing like that." He testified :

I didn't see anything that stuck out or stood out that would lead me to believe that he was struck from the rear end or that his vehicle hit another vehicle maybe when he was going around or something that would have caused this crash other than his driving behavior.

Defendant testified that in December 2017, he slid into a yellow pole, had been unable to get the yellow paint off, and had spray-painted his car with "Dupli-Color." Defendant alleged that the officer either had not tested the paint or did test it and did not disclose the results. The

testimony of the officer, however, does not conflict with defendant's testimony.[2] The deputy testified that he did not see evidence of the badly-damaged car having been struck by another vehicle; the deputy did not claim to have tested all paint on the car to determine whether it was original. Defendant's assertion that he had previously painted over yellow paint from a scrape against a pole may be accurate, but does not contradict the deputy's testimony that he did not see evidence, such as paint, on the car that would indicate a collision with another vehicle. Defendant thus fails to establish that the prosecutor presented false testimony.

### 3. JUROR BIAS

Defendant contends that a biased juror was allowed to remain on the jury. We review this unpreserved issue under the plain-error doctrine. *Carines*, 460 Mich at 763-764. On the second day scheduled for trial, the trial court placed a clarification on the record. The trial court explained that during jury selection, the potential juror in seat number 2 told the court's law clerk that she was having a panic attack and was not sure that she could make it through a trial. The law clerk reported that the juror had been shaking and had told the law clerk that she had a friend who had been killed by a drunk driver the prior year, but the juror had been too anxious to discuss the matter before the court. The trial court recounted that it called the prosecutor and defense counsel out of the courtroom and the three discussed the law clerk's report, then agreed that the prospective juror should be removed for cause. The attorneys confirmed the trial court's summation of what occurred. Defendant contends that the next day the juror from seat number 2 was still present. However, the prospective juror in question was excused from the jury venire before trial began. Defendant saw a proper juror who had been seated on the jury during jury selection, not the previously excused potential juror. Defendant has failed to identify error.

### 4. SPEEDY TRIAL

Defendant contends that he was denied his right to a speedy trial; we review this issue de novo. See *People v Rivera*, 301 Mich App 188, 193; 835 NW2d 464 (2013). A defendant has a right to a speedy trial. US Const, Am VI; Const 1963, art 1, § 20; see also MCL 768.1; MCR 6.004(A). Whether a defendant has been denied a speedy trial depends upon (1) the length of the delay, (2) the reason for the delay, (3) whether the defendant asserted the right to a speedy trial, and (4) whether the defendant was prejudiced. *People v Williams*, 475 Mich 245, 261-262; 716 NW2d 208 (2006). The length of the delay is calculated from the date of the defendant's arrest. See *id*. at 261. The delay is presumed to be prejudicial to the defendant if it was longer than 18 months; if the delay was less than 18 months, the defendant must demonstrate that he or she was prejudiced by the delay. *Id*.

In this case, defendant was arrested in June 2019, and trial commenced in September 2021, after a delay of approximately 27 months. A "presumptively prejudicial delay triggers an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial." *People v Wickham*, 200

---

[2] In addition, no witness to the crash testified that another vehicle struck defendant's vehicle causing it to crash.

Mich App 106, 109-110; 503 NW2d 701 (1993). With regard to factor (2), the reason for the delay, delays inherent in the court system, such as docket congestion, are technically attributable to the prosecution but generally are considered neutral and given only minimal weight in a speedy-trial analysis. *Williams*, 475 Mich at 263.

In the context of the 180-day rule,[3] this Court concluded that delay primarily resulting from our Supreme Court's decision to suspend jury trials in response to the Covid-19 pandemic were not attributable to either party. See *People v Witkoski*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 355299); slip op at 3. The reasoning of *Witkoski* is equally applicable when considering the effect of that delay on the constitutional right to speedy trial, in that the directives of our Supreme Court must be followed by the lower courts, and therefore the prosecution should not be penalized by them.

Here, a few months of the delay resulted from the request for a competency hearing and defendant's request for new counsel, and a delay from December 2019 to January 2020 was apparently caused by docket congestion. Trial originally was set to begin in May 2020, less than a year from defendant's arrest, but COVID-19 restrictions caused the delay from March 2020 until June 2021. September 2021 was evidently the earliest date thereafter available on the trial court's docket. We conclude that under the circumstances there was no inexcusable delay by the prosecution. See *Williams*, 475 Mich at 262. We further conclude that defendant has failed to demonstrate prejudice to his defense as a result of the delay. Defendant argues that his bond was excessive and that he was forced to be incarcerated for a long period as a result. But the trial court adequately explained why it would not reduce bond, stating, in part, that defendant had "immediately violated" earlier bond conditions on the basis of alcohol consumption and posed a risk to the public. Under the totality of the circumstances, reversal on the basis of a speedy-trial violation is unwarranted.

Affirmed.

/s/ Michael F. Gadola
/s/ Kristina Robinson Garrett
/s/ Kathleen A. Feeney

---

[3] MCL 780.131(1), referred to as the 180-day rule, requires dismissal of the case if the prosecution fails to commence action on charges pending against an inmate within 180 days after the [Department] delivers notice of the inmate's imprisonment. *People v Lown*, 488 Mich 242, 246; 794 NW2d 9 (2011).